85 F.3d 1050
 64 USLW 2812, 17 A.D.D. 257
 Colleen RUSSMAN, a child with disabilities, by her parents,
Patricia and Paul RUSSMAN, Plaintiffs-Appellees,
v.
Thomas SOBOL, as Commissioner of the New York State
Education Department, Defendant,
Board of Education of the Enlarged City School District of
the City of Watervliet, New York, Defendant-Appellant.
 No. 996, Docket 95-7756.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 1, 1996.
Decided June 12, 1996.
As Amended June 27, 1996.
 
 Cory Haines, Law Intern, Disabilities Law Clinic of Albany Law School, Albany, New York (Nancy M. Maurer; Joseph Connors; Michael Cardinale, law intern, of counsel), for Plaintiff-Appellee.
 Stephen F. Bailly, Hicks & Bailly, Albany, New York, for Defendant-Appellant.
 Michael L. Costello, Albany, New York (Richard E. Barnes, John A. Liekweg, Mark A. Mainello, of counsel), for Amicus Curiae New York State Catholic Conference.
 Gerald A. Rosenberg, Rosenman & Colin, New York City (John F. Finnegan, Bruce M. Sabados, Rosemary Halligan, Stacey B. Creem, of counsel), for Amici Curiae New York State Schools are for Everyone, the National Association of Protection and Advocacy Systems, and Western New York Disability Law Coalition.
 Jay Worona, Albany, New York (Pilar Sokol, of counsel), for Amicus Curiae New York State School Boards Association, Inc.
 Before: OAKES, WINTER, and WALKER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This appeal presents important questions concerning obligations imposed upon public school authorities by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and the constitutionality of those obligations under the Establishment Clause of the First Amendment. Colleen Russman and her parents commenced this suit against the Board of Education of Watervliet, New York (the "school district"), alleging that the school district's refusal to provide Colleen special education services at a parochial school violates Section 1413 of New York Educ. Law § 3602-c, and the Free Exercise Clause of the First Amendment to the United States Constitution. On cross-motions for summary judgment, Magistrate Judge Smith granted judgment for the school district on the grounds that: (i) IDEA forbids the school district from using federal funds to provide instructional services at a parochial school; (ii) New York law does not require the school district to provide special education services at parochial schools; and (iii) such aid is forbidden by the Establishment Clause of the First Amendment to the United States Constitution. Judge Cholakis reversed Magistrate Smith's ruling and granted summary judgment for the Russmans.[1] The school district appeals, and we affirm.
 
 BACKGROUND
 
 2
 The pertinent facts are not in dispute and were set forth in detail in the two district court opinions, Russman v. Board of Educ., No. 93-CV-905, slip op. (N.D.N.Y., June 30, 1995); Russman v. Board of Educ., No. 93-CV-905, slip op. (N.D.N.Y., June 22, 1994), familiarity with which is assumed. Colleen Russman, currently fifteen years old, has been classified as mentally retarded since 1986. For the first five years of her schooling, Colleen was educated in classes set aside by the school district exclusively for children with disabilities. In the Spring of 1991, Colleen's parents asked the school district's Committee on Special Education to develop an Individualized Educational Program ("IEP") for Colleen that would allow her to be "mainstreamed" into a regular, age-appropriate class. The IEP developed by the district called for the services of a consultant teacher to work with the regular classroom teacher in modifying the academic curriculum for Colleen and a teaching aide to assist Colleen directly with her studies. It provided as well for speech and occupational therapy. The parties agree that the mainstream program is appropriate for Colleen and that the services described in the IEP are necessary for her to be mainstreamed successfully. Agreement ends here.
 
 
 3
 Colleen and her parents wish to implement the IEP at St. Brigid's Regional Catholic School, the school that Colleen's two sisters attend. The Russmans can and will pay St. Brigid's tuition, but they cannot afford to pay for the support services of a consultant teacher and a teaching aide. The Russmans do not seek special education services in connection with religious courses but only in connection with core academic subjects such as math and English. The school district refuses to implement the plan at a parochial school. Although the district provides speech and occupational therapy to other students at a "neutral" site at St. Brigid's, the school district contends that the provision of a consultant teacher and a teaching aide for Colleen at St. Brigid's would violate the Establishment Clause of the First Amendment.
 
 
 4
 The school district's decision to provide Colleen with special education benefits only at a Watervliet public school was upheld by an impartial hearing officer on December 24, 1992. That decision was affirmed by the state review officer of the New York State Education Department on March 8, 1993. Subsequently, Colleen, then eleven years old, and her parents brought the present action alleging that the failure to provide the services at St. Brigid's violates the Free Exercise Clause of the First Amendment to the United States Constitution as well as federal and state statutory law. During the pendency of the administrative proceedings and this litigation, Colleen has had her IEP implemented in a Watervliet public school.
 
 DISCUSSION
 
 5
 We review a district court's grant of summary judgment de novo, United States v. Articles of Banned Hazardous Substances, 34 F.3d 91, 96 (2d Cir.1994), affirming only where there are no genuine issues of material fact and the moving party is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 A. The Establishment Clause
 
 6
 The First Amendment of the United States Constitution provides in relevant part that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. The school district argues that the Establishment Clause prohibits it from implementing Colleen's IEP at St. Brigid's. We disagree.
 
 
 7
 Where government programs are made available to a broad class of citizens defined in a religion-neutral fashion, the individuals receiving the benefits may choose to use them in a religious setting, and the program does not thereby violate the Establishment Clause. See Witters v. Washington Dept. of Servs. for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (Establishment Clause does not forbid blind student studying at Christian college from receiving generally available state assistance distributed to blind students for vocational training); Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (state law that provided tax deductions for certain educational expenses not unconstitutional even though deductions might primarily benefit parents whose children attended sectarian schools); see also Rosenberger v. Rector and Visitors of the Univ. of Virginia, --- U.S. ----, ---- - ----, 115 S.Ct. 2510, 2521-24, 132 L.Ed.2d 700 (1995) (state university does not violate Establishment Clause by funding printing services for student newspaper with heavily Christian themes where printing services are provided as part of policy of funding all student newspapers without respect to religion).
 
 
 8
 In Zobrest v. Catalina Foothills School District, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), the Supreme Court held that a public school district may constitutionally use IDEA funds to provide a sign language interpreter for a deaf student at a Catholic high school. Id. at 13, 113 S.Ct. at 2469. Under Zobrest, the provision of governmental services to a religious school will survive a First Amendment challenge if: (i) the services are provided in a neutral manner without regard to religion; (ii) the services are provided at the parochial school not as a result of legislative choice but rather as a result of the private choice of the individual utilizing the services; and (iii) the funds traceable to the government do not "find their way into the sectarian schools' coffers." Zobrest, 509 U.S. at 10, 113 S.Ct. at 2468.
 
 
 9
 The special assistance required by Colleen's IEP would satisfy these factors if provided at St. Brigid's. First, the assistance is a neutral governmental service made available without regard to religion. See id. at 10, 113 S.Ct. at 2467-68. Second, the teaching aide and teaching consultant will provide services at St. Brigid's solely because of a decision made by the Russman family. See id. Third, the special education benefits flow directly to Colleen and do not financially benefit St. Brigid's. See id. (funds spent on special education services under IDEA not co-mingled with funds belonging to sectarian schools); see also Rosenberger, --- U.S. at ---- - ----, 115 S.Ct. at 2523-24 (where school pays third-party contractor to perform services to program beneficiaries and funds are not paid directly to religious organization, benefit received by religious organization is incidental and does not violate Establishment clause). Thus, provision of the stipulated services to Colleen falls within the scope of permissible activity under Zobrest.
 
 
 10
 We are not persuaded by the school district's argument that under Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), it is prohibited from providing such services to Colleen. In Meek and Ball the Court struck down government programs that provided teachers, counselors, teaching materials, and equipment to sectarian schools. However, both cases involved massive grants provided directly to the parochial schools so as to benefit the religious institutions financially. See Meek, 421 U.S. at 364-65, 95 S.Ct. at 1762-63 (direct loan of teaching material and equipment, as well as teachers and guidance counselors, to private schools, 75 percent of which were religious); Ball, 473 U.S. at 375-79, 105 S.Ct. at 3218-20 (discussing school district's shared time and community education programs, which provided classes to sectarian school students at public expense). These cases are therefore inapposite.
 
 
 11
 The school district also fails to persuade us that Zobrest authorizes only entirely mechanical assistance, such as verbatim translations by sign language or physical assistance in traveling. Although we recognize that, unlike the sign-language interpreter in Zobrest, the teaching aide and consultant here provide cognitive assistance, this distinction is not dispositive. The primary purpose of both a sign language interpreter and a teaching aide is solely to make the material intelligible to the disabled student, not to create a particular religious message or to advance a particular religious viewpoint. In such cases there is little danger of "excessive entanglement" by government actors with religion. See Lemon v. Kurtzman, 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). To hold otherwise would interpret Zobrest in a way that distinguishes between students with physical disabilities, for whom mechanical assistance is necessary, and those with mental disabilities, for whom cognitive assistance is necessary, for purposes of IDEA. The statute makes no such distinction, and we decline to carve one into the Constitution. Because we decline to differentiate between cognitive and physical assistance, the parties' dispute over whether religious content can be found in St. Brigid's core curriculum is immaterial.
 
 
 12
 We turn now to the question of whether the state is required to provide these services at non-public schools.
 
 B. The Individuals with Disabilities Act
 
 13
 The IDEA conditions monetary grants to states by requiring that they provide a "free appropriate public education" to disabled children, 20 U.S.C. § 1412(1), including special education or other services as needed by particular children, 20 U.S.C. §§ 1412(4), § 1414(a)(5). If necessary, a state may place a disabled child in a private school at public expense. 20 U.S.C. § 1413(a)(4)(B).
 
 
 14
 The statute imposes somewhat different obligations regarding disabled children who are voluntarily placed in private schools. It requires states to "provid[e] for such children special education and related services." However, this obligation is limited by the phrase "to the extent consistent with the number and location of" such children in a state. Turning to pertinent regulations, 34 C.F.R. § 300.403, provides that:
 
 
 15
 [i]f a child with a disability has a [free appropriate public education] available and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility. However, the public agency shall make services available to the child as provided under [various regulations].
 
 
 16
 Other regulations state that school districts must afford to children who attend private schools benefits that are "comparable in quality, scope, and opportunity for participation to the program benefits that the [district] provides for students enrolled in public schools." 34 C.F.R. § 76.654(a). They also require that each local educational authority "provide special education and related services designed to meet the needs of private school children with disabilities."
 
 
 17
 The school district argues that although the IDEA requires it to provide Colleen with special education services, nothing in the statute or regulations requires that the school district provide the services on-site at a private school. The caselaw on this issue is mixed. At least two district courts have held that the IDEA compels states to provide on-site benefits to handicapped children at non-public schools. See Cefalu v. East Baton Rouge Parish Sch. Bd., 907 F.Supp. 966 (M.D.La.1995) (IDEA requires school district to provide sign-language interpreter for deaf student at parochial school); Fowler v. Unified Sch. Dist. No. 259, 900 F.Supp. 1540 (D.Kan.1995) (school district required to provide interpretive services for deaf student at private, non-sectarian school).
 
 
 18
 However, two courts of appeals have held to the contrary. In Goodall v. Stafford County Sch. Board, 930 F.2d 363 (4th Cir.), cert. denied, 502 U.S. 864, 112 S.Ct. 188, 116 L.Ed.2d 149 (1991), the Fourth Circuit held that where a school district offered to provide services to disabled students at a public school, the Education of the Handicapped Act ("EHA"), an earlier version of the present IDEA, see Education of the Handicapped Amendments of 1990, Pub.L. No. 101-476, § 901, 104 Stat. 1103, 1141 (1990) (revising short title), did not require that the district make the services available to students at a sectarian school. In K.R. v. Anderson Community School Corporation, 81 F.3d 673 (7th Cir.1996), the Seventh Circuit held that a school district had discretion under the IDEA and pertinent regulations to decline to offer a full-time instructional assistant to a student at a private school so long as such an assistant was offered to the student at the public school. Cf. McNair v. Cardimone, 676 F.Supp. 1361 (S.D.Ohio 1987) (EHA does not compel provision of transportation to and from private school for child with hearing impairments), aff'd, 872 F.2d 153, 156-57 (6th Cir.1989) (affirming on ground that transportation is not service required by child's disability but refusing to reach question whether EHA compelled provision of necessary services to handicapped children attending private schools).
 
 
 19
 It appears that the Department of Education shares the view that the IDEA affords some discretion regarding the on-site provision of special educational services at private schools. See 20 Individuals With Disability Educ.L.Rep. 1440 (1994) (memorandum stating that private school children need only be afforded genuine opportunity for equitable participation and have no entitlement to full range of services offered public school children); 22 Individuals With Disabilities Educ.L.Rep. 369 (1994) (response letter stating same); 16 Educ. for Handicapped L.Rev. 1398-1400 (1990) (response letter stating that whether or not public school needs to provide on-site services at private school depends on specific facts); 49 Fed.Reg. 48522 (1984) (public schools have "discretion to devise ... the most efficient scheme possible for providing adequate special education and related services to a number of, but not necessarily all, private school handicapped children"); 45 Fed.Reg. 22570 (1980) (public school need offer only genuine opportunity for equitable participation and what constitutes "genuine opportunity" will "vary widely, depending on local circumstances").
 
 
 20
 Although we do not take the position that the IDEA requires the on-site provision at private schools of any and all services that might be required in the context of public education, we read the statute to accord greater rights to disabled children voluntarily in private schools than do some of the authorities cited above. In particular, we view Goodall as unpersuasive. Goodall relied, inter alia, on 34 C.F.R. § 76.532, which prohibits the use of IDEA funds for "religious ... instruction." 930 F.2d at 369. This regulation is coextensive with the Establishment Clause and does not create any separate regulatory limitation on IDEA. See Zobrest, 509 U.S. at 7 n. 7, 113 S.Ct. at 2465 n. 7. Central to Goodall's holding was its view that provision of special services to a student in a parochial school would be unconstitutional and thus violative of Section 76.532. Because we hold that the provision of services to Colleen Russman at St. Brigid's does not violate the Establishment Clause, see supra, we conclude that it likewise does not violate Section 76.532.
 
 
 21
 Although Anderson is somewhat more persuasive, it nevertheless accorded excessive discretion to school authorities to deny the on-site provision of services to disabled students in private schools. Anderson relied principally on the different statutory and regulatory language used with regard to disabled students attending public schools and those voluntarily placed in private schools. Based on these differences, it concluded that there was "little doubt that ... Congress intended to give disabled students voluntarily attending private school a lesser entitlement," 81 F.3d at 678, and permitted school authorities to refuse to provide an instructional assistant to a disabled student in a private school. Id. at 679.
 
 
 22
 Anderson is unquestionably correct that the rights accorded disabled students in public schools differ from those accorded such students voluntarily placed in private schools. However, the principal difference stems from the IDEA language limiting the obligation of states to provide special education and related services to private school students "to the extent consistent with the number and location" of disabled children voluntarily in private schools. Anderson failed, however, to analyze the import of the specific language with regard to the individualized service that was denied.
 
 
 23
 In our view, the quoted reference to the "number" of students involves services to groups of students rather than the individualized service at issue in Anderson and in the present case. If, to take a simple example, one occupational therapist can efficiently aid five disabled students and three therapists are available in a public school attended by fourteen such children, public school authorities are not required by the IDEA to provide a therapist to a private school with only one such student. In our view, the statute affords discretion to offer occupational therapy to the private school child only at a public school because of the higher per-student cost of providing it at the private school. However, nothing in the quoted language suggests that, where a private school is attended by five disabled children and the cost per student of providing an occupational therapist at the private or public school is identical, school authorities may limit such services to the public school. Nor does the language suggest that an individually tailored service may be offered only at a public school. The reference to the "number" of students suggests only that school districts have discretion to deny on-site provision of services at private schools where economies of scale in providing the services at one place exist.
 
 
 24
 With respect to the statutory reference to "location," we read the IDEA to mean only that, where the provision of services at a distant private school would entail significant additional costs, e.g., transportation, to be borne by the state, public school authorities may fulfill their IDEA obligations by offering the services at a local public school.
 
 
 25
 We do not, therefore, agree with Anderson 's vesting of school authorities with broad discretion to deny on-site individualized services to private school students. Indeed, apart from the limiting language discussed above, the statute and regulations are more consistent with mandatory entitlements than with discretionary authority. Where the cost of special services does not vary with where they are provided, the IDEA and regulations regarding voluntary private school students make little sense if such services may be made available only in the public schools. The statute and regulations require that necessary services be provided to disabled private school students according to their needs rather than the name of their school, see Zobrest, 509 U.S. at 13, 113 S.Ct. at 2469, and state that such services must be "comparable in quality, scope, and opportunity for participation" to those offered to public school students. 34 C.F.R. § 76.654. Use of the word "comparable" strongly suggests that the provision of services will usually take place outside the public school. Otherwise, the regulation would simply provide that any services for the disabled available at a public school must be open to private school students.
 
 
 26
 Moreover, if services required by the IDEA need be provided only in public schools even absent fiscal concerns, then private school students are entitled under the IDEA to little more than after-school services. Most services required by an IEP must be provided during school hours to be effective. For example, a teaching consultant cannot benefit a disabled student in a private school if available only outside her school and divorced from her curriculum. If public school authorities may freely refuse to provide such benefits at private schools, therefore, disabled students must either forgo the IDEA benefits, bear their cost, or transfer to the public schools. This result, however, seems to be precisely what the statute and regulations seek to preclude. Indeed, the principal purpose of the statutory and regulatory commands appears to make a child's disability irrelevant to the family's choice of school, at least where differences in costs of provision do not exist.
 
 
 27
 Turning specifically to the facts of the present case, no claim is made by the school district that providing Colleen Russman with a teaching consultant and teaching aide at St. Brigid's is significantly more expensive than providing the same services at the public school. Indeed, the only reason offered by the district for the denial of services is its view that the Establishment Clause prohibits the on-site provision of such services at a parochial school, an issue disposed of above. To obtain the benefits to which she is entitled under the IDEA, Colleen has been forced to abandon her choice of school, a result contrary to the purpose of the statute. We therefore hold that the IDEA requires the school district to provide Colleen with the consultant and aide at St. Brigid's.
 
 
 28
 In view of our disposition of this matter, we need not address the Russmans' Free Exercise and state law claims.
 
 
 29
 We therefore affirm.
 
 
 
 [1]
 Although Judge Cholakis's opinion suggests that some issues of fact remain for trial, see Russman v. Board of Education, No. 93-CV-905, slip op. at 5-6, 12 n. 12 (N.D.N.Y., June 30, 1995), a final judgment was nevertheless entered for plaintiffs. We see no issue for trial