STEPHEN H. ANDERSON, Circuit Judge.
This case involves the question of whether a public school district, defendant Unified School District No. 259 (the “District”), in Sedgwick County, Kansas, must pay for full-time sign language interpretive services at a private school, for the benefit of a profoundly deaf child whose parents have voluntarily removed him from a public school in the District and placed him in the private school. The plaintiffs, Michael Fowler and his parents and next friends, Jay and Barbara Fowler, seek such services under the Individuals with Disabilities Education Act and Kansas law. They seek them on-site at the private school because those services only benefit Michael if they accompany him throughout his educational day. The district court granted injunctive relief, ordering the District to provide those services without regard to cost. We partially reverse and remand, holding that, under the applicable statutes and regulations, the District must pay for those required on-site services an amount up to, but not more than, the average cost to the District to provide interpretive services to hearing-impaired students in the public schools. We remand for further proceedings consistent with this opinion.
The district court awarded attorneys’ fees and expenses to the Fowlers as prevailing parties. We affirm the award of attorneys’ fees.
*-784 BACKGROUND
Michael was born on August 5, 1985, and contracted meningitis at the age of six months, which left him profoundly, and prel-ingually, deaf. Because he requires specially designed instruction for this condition, he qualifies as a child with disabilities under Part B of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1420 (“IDEA”). See § 1401(a)(1)(A)(i), (ii) (1990 & Supp.1996); 34 C.F.R. § 300.7(a)(1) (1996). He attended Caldwell Elementary School, a public school in the District, from kindergarten through the third grade. Of the 400 students at Caldwell, approximately 30 had severe hearing impairments and required interpretive services. These 30 students were all the severely hearing impaired students in the District, whom the District elected to cluster at Caldwell Elementary. The District had funding for nine full-time interpreters, but only had eight such interpreters during the 1994-95 school year, because of the resignation of one interpreter and the difficulty in finding qualified interpreters in Signed Exact English II (“SEE II”).[1] At Caldwell, Michael received sign language interpretive services from interpreters trained in speeeh/language services, audiological services and assistive services. These services were provided to Michael pursuant to his individualized education program (“IEP”), required by the IDEA.[2]
In November 1993, the District tested Michael and found him to be “of very superior intellectual capacity,” and he was eventually designated as gifted. Fowler v. Unified Sch. Dist. No. 259, 900 F.Supp. 1540, 1541 (D.Kan.1995). Unhappy with whatever the District could offer to address Michael’s gift-edness at Caldwell Elementary, the Fowlers requested a review of Michael’s IEP and notified the District that they objected to his placement and educational program. In accordance with the IDEA 20 U.S.C. § 1415(b)(1), (2), and Kansas law, Kan.Stat. Ann. § 72-972, on May 23, 1994, the Fowlers requested a Level I due process hearing in order to challenge the appropriateness of Michael’s IEP.
The Fowlers then enrolled Michael in Wichita Collegiate, a private nonseetarian school where they believed his intellectual needs would be better met. They requested that the District provide to Michael interpretive services on site at Wichita Collegiate. The District denied the request.[3]
The due process hearing took place on August 4, 1994. The hearing officer issued his.decision on August 25, and held that the District was required under the IDEA and Kan.Stat.Ann. § 72-5393 to provide interpretive services for Michael at Wichita Collegiate.[4] The District appealed that decision to the State Board of Education. A state Review Officer held a hearing and, on November 4, reversed the hearing officer’s decision, concluding that the District was not compelled to provide interpretive services to Michael at Wichita Collegiate. The Fowlers appealed that decision in federal district court, pursuant to 20 U.S.C. § 1415(e)(4)(A).
The district court, after finding that “the District cannot deny interpretive services to Michael at Collegiate unless it can prove there is no reasonable way to provide those services,” held that the Fowlers had “shown *-783 by a preponderance of the evidence that the District must provide interpretive services to Michael at Collegiate....” Fowler, 900 F.Supp. at 1546. It therefore granted the Fowlers’ motion for injunctive relief and ordered the District to provide interpretive services to Michael at Wichita Collegiate. It also awarded the Fowlers $15,550.43 in reimbursement for the cost of interpretive services for the 1994-95 school year and “an additional amount for the cost of services to date in the 1995-96 school year.” Id. The court subsequently granted the Fowlers’ application for attorneys’ fees and expenses. The District filed a motion to stay the injunction and the reimbursement award. The court denied the stay of the injunction, but did grant a stay of the money judgment. The District appeals both orders.
The District argues that: (1) the IDEA and its implementing regulations do not mandate provision of individualized special education services for students whose parents have voluntarily placed them in private schools; (2) the Department of Education has consistently interpreted the Act and regulations to require no such individualized services, and that interpretation is entitled to some deference; and (3) Kansas law similarly imposes no such obligation where the individualized services cannot be “practically provided” or if they result in services not being provided on an “equal basis.” The District also argues the district court erroneously placed upon it the burden of proving that there was “no reasonable way to provide those services” to Michael. Fowler, 900 F.Supp. at 1546. The District further challenges the award of attorneys’ fees and costs.
Amicus briefs have been filed by: (1) the National School Boards Association, in support of the District; (2) Kansas Advocacy & Protective Services, Inc., in support of the Fowlers; (3) the Most Reverend James P. Keleher, Archdiocese of Kansas City, Kansas, the Most Reverend Stanley G. Schler-man, Diocese of Dodge City, Kansas, the Most Reverend George K. Fitzsimons, Diocese of Salina, Kansas, and the Most Reverend Eugene J. Gerber, Diocese of Wichita, Kansas, in support of the Fowlers; (4) the National Association of the Deaf, the National Cued Speech Association, The American Society for Deaf Children, and the Kansas Association of the Deaf, in support of the Fowlers; and (5) the United States, in support of the District.
DISCUSSION
I. IDEA and Federal Regulations
The IDEA provides federal grants to states, which states then use as part of the funds they give to local educational agencies, to assist such agencies in educating students with disabilities. A state electing to participate in this system of IDEA grants must establish and have “in effect a policy that assures all children with disabilities the right to a free appropriate public education.” 20 U.S.C. § 1412(1). To accomplish this objective, local educational agencies (“LEA”s) must develop, implement and regularly review and revise an IEP for each disabled child, which is designed to ensure that the child receives, at public expense, the free appropriate education required by the Act. §§ 1412(4), 1414(a)(5). The relevant IDEA provisions and related regulations distinguish between three groups of disabled students: (1) those attending public schools; (2) those placed in private schools by the LEA or school district; and (3) those who have been voluntarily placed in private schools by their parents. See 20 U.S.C. §§ 1412(1), (2)(B), 1413(a)(4)(A), (B); 34 C.F.R. §§ 300.400-.452, 76.650-.655; see also Cefalu v. East Baton Rouge Parish Sch. Bd., 103 F.3d 393 (5th Cir.1997); K.R. ex. rel M.R. v. Anderson Community School Corp., 81 F.3d 673 (7th Cir.1996), petition for cert. filed, 65 U.S.L.W. 3166 (U.S. Aug. 26, 1996) (No. 96-323). Those attending public schools are, under the IDEA, entitled to a “free appropriate public education” at the public expense, which includes special education and related services, if necessary. §§ 1412, 1401(a)(18), 1414. Children placed in private schools by LEAs or other state agencies “will be provided special education and related services ... at no cost to their parents or guardian....” § 1413(a)(4)(B)©.
With respect to students voluntarily attending private schools, the Act provides that each state must:
*-782 set forth policies and procedures to assure — that, to the extent consistent with the number and location of children with disabilities in the State who are enrolled in private elementary and secondary schools, provision is made for the participation of such children in the program assisted or carried out under this subchapter by providing for such children special education and related services.
§ 1413(a)(4)(A) (emphasis added). The pertinent regulations further address, although with little clarity, the meaning of the statutory requirement that special education services be “provided” to such students. The language of 34 C.F.R. § 300.451(a) basically tracks the language of the IDEA by requiring state educational agencies (“SEA”s) to provide “for the participation of private school children with disabilities in the program assisted or carried out ... by providing them with special education and related services” “[t]o the extent consistent with their number and location in the State.” Id. The regulations then stipulate that LEAs “shall provide special education and related services designed to meet the needs of private school children with disabilities residing in the jurisdiction of the agency.” § 300.452.[5] The regulations also state that “[t]he requirements of 34 CFR §§ 76.651-76.662 [the EDGAR regulations must be] met.” § 300.451(b).[6]
Under those EDGAR regulations, an LEA, as a “subgrantee” of the state under the IDEA, “shall provide students enrolled in private schools with a genuine opportunity for equitable participation ” in program benefits. 34 C.F.R. § 76.651(a)(1) (emphasis added). That opportunity to participate must be provided “in a manner that is consistent with the number of eligible private school students and their needs.” § 76.651(a)(2). Further, the benefits provided to private school enrollees must be “comparable in quality, scope, and opportunity for participation to the program benefits” that the LEA provides to public school enrollees. § 76.654(a).
In developing a program for the delivery of special education services, the LEA/sub-grantee “shall consult with appropriate representatives of students enrolled in private schools ... including consideration of [wjhich children will receive benefits,” “[w]hat benefits will be provided,” and “[h]ow the benefits will be provided.” § 76.652(a). The EDGAR regulations also provide that, in assessing the needs, number of students, and benefits to be provided to private school enrollees, the LEA/subgrantee must make those decisions “on a basis comparable to that used by the subgrantee in providing for participation of public school students.” § 76.653. Finally, the regulations provide that “[i]f the needs of students enrolled in private school are different from the needs of students enrolled in public schools, a subgrantee shall provide program benefits for the private school students that are different from the benefits ... provide[d] for the public school students.” § 76.654(c).
The regulations similarly provide that LEAs/subgrantees must “spend the same average amount of program funds on [a] student enrolled in a private school who receives benefits ... and [a] student enrolled in a public school who receives benefits.... ” § 76.655(a)(1), (2). However, the LEA “shall spend a different average amount on program benefits for students enrolled in private schools if the average cost of meeting the needs of those students is different from the average cost of meeting the needs of students enrolled in public schools.” § 76.655(b).
*-781 The question presented in this ease is whether the statute and those regulations, or Kansas law, require the District to provide interpretive services to Michael, a student voluntarily enrolled in a private school by his parents, on-site at the private school.[7] As the Second Circuit has recently acknowledged, “[t]he caselaw on this issue is mixed.” Russman v. Sobol, 85 F.3d 1050, 1055 (2d Cir.1996), petition for cert. filed, 65 U.S.L.W. 3381 (U.S. Nov. 18, 1996) (No. 96-776). This is so because, as the Fifth Circuit has observed, “the IDEA.and its implementing regulations are amorphous in design and imprecise in message.” Cefalu, 103 F.3d at 397. While several district courts, besides the one below, held that the IDEA imposes a requirement to provide services on-site at private schools for parentally-placed students, two of those decisions have been recently reversed.[8] Four circuit court cases do not impose such a requirement, at least not in all eases. The rationale and emphasis of the decisions is not uniform, however, even among those decisions which reach similar results. A survey of the caselaw is therefore helpful.
A. Other Circuit Court Decisions
The first two circuit court decisions to address this issue held that LEAs have virtually unfettered discretion to decide whether to provide services to parentally-placed private school students. See Anderson, 81 F.3d 673 (7th Cir.1996) (involving a student with disabilities voluntarily attending a private school who sought the provision by the school district of a full-time instructional assistant on-site); Goodall v. Stafford County Sch. Bd., 930 F.2d 363 (4th Cir.1991) (involving a deaf student voluntarily attending a private school who sought the provision of a full-time cued speech interpreter on-site). Both courts observed that the statute and the regulations distinguish between students with disabilities enrolled in private schools by the LEA and students with disabilities enrolled in private schools by their parents. Anderson, 81 F.3d at 678; Goodall, 930 F.2d at 366. Both concluded that the LEA had discharged its obligations under the statute and the regulations by providing the student with the “opportunity” to participate in the special education service at the public school. Anderson, 81 F.3d at 680; Goodall, 930 F.2d at 368.
The next circuit court decision addressing this issue disagreed With the essential reasoning in Goodall and Anderson. In Russ-man, a child with disabilities voluntarily attending a private parochial school sought to require the school district to provide her with an on-site consultant teacher and teaching aide. The district court held in favor of the student, and the school district appealed. The Second Circuit affirmed, concluding that the school district was obligated to provide such services to the student. Russman, 85 F.3d 1050. The court acknowledged that the IDEA “imposes somewhat different obligations regarding disabled children who are voluntarily placed in private schools.” Id. at 1054. The Russman court then disagreed with Anderson, which, in its view, gave “excessive discretion to school authorities to deny the on-site provision of services to disabled students in private schools.” Id. at 1056. Focusing on the obligation, under the IDEA and its implementing regulations, to provide special education and related services “to the extent consistent with the number and location” of disabled children volun *-780 tarily attending private schools, the court held that “the quoted reference to the ‘number’ of students involves services to groups of students rather than the individualized service at issue in ... the present case.” Id. The court concluded that cost was a central factor:
The reference to “number” of students suggests only that school districts have discretion to deny on-site provision of services at private schools where economies of scale in providing the services at one place exist.
With respect to the statutory reference to “location,” we read the IDEA to mean only that, where the provision of services at a distant private school would entail significant additional costs, e.g., transportation, to be borne by the state, public school authorities may fulfill their IDEA obligations by offering the services at a local public school.
Id. Thus, “[w]here the cost of special services does not vary with where they are provided,” the school district is obligated to provide them to a child voluntarily attending a private school, if the student cannot take advantage of the comparable service at the public school and still attend the private school. Id. Because, in Russman, the school district made no claim that providing the student with a consultant and teaching aide at the private school was “significantly more expensive than providing the same services at the public school,” the court held the district was obligated to provide such services onsite. Id. at!057.
The most recent circuit court decision, Ce-falu, involved the identical issue as in this case: whether a school board was obligated to provide on-site sign language interpretive services to a deaf child voluntarily attending a private school. The district court ruled in favor of the child, ordering the school board to provide such services, but the Fifth Circuit vacated that decision. After acknowledging the vague and imprecise language of the IDEA and its regulations, the court nonetheless discerned certain guiding principles: “[f]irst, and fundamental, the drafters of the IDEA plainly intended that students voluntarily enrolled in private schools be active participants in and beneficiaries of the program.” Cefalu, 108 F.3d at 397. The court also recognized that “educational agencies must be afforded the broadest discretion to design special programs in the light of the finite funds that are available,” although that discretion is not unfettered. Id. at 397.
The second guiding principle the Fifth Circuit gleaned from the statute and the regulations was the following: “although private school students are eligible to receive benefits under the program, they are not entitled to a greater share of benefits, nor of the funds providing those benefits, per student, than similarly-situated students in public schools.” Id. at 398. From those two principles, the court derived the following rule:
The private school student must make an initial showing of a genuine need for on-site services, based upon more than mere convenience. Upon such a showing, the agency must provide on-site services unless it presents a justifiable reason, either economic or non-economic, for its denial of on-site services. The student then bears the burden of showing that the agency’s position is inconsistent with the IDEA and its regulations, or is not rationally supportable, or is otherwise arbitrary.
Id. As the court further observed, the practical effect of such a rule is that “private students usually will, absent justifiable non-economic considerations, be provided comparable services on-site to the extent that such services can be provided on-site at the same approximate cost as that incurred in providing the services at other sites.” Id. Conversely, the rule will “also ensure that disproportionately large sums of money are not required to be spent to benefit a reduced number of students.” Id.
B. Department of Education Position
As the foregoing decisions all acknowledged, the Department of Education, through its Office of Special Education Programs, has consistently stated its position, in policy letters and memoranda, that parentally-placed students attending private schools do not have an “individual entitlement to services.” Letter to Burch, 23 IDELR 560, 562 (1995); Letter to Anonymous, 23 IDELR *-779 650, 652 (1995). Rather, the regulations “authorize State and local educational agencies to make determinations as to the number of private school children with disabilities who will be served, and about the nature and extent of services to be provided.” Letter to Burch, 23 IDELR at 562. The District argues that the agency’s interpretation is reasonable and, as such, is entitled to substantial deference.
C. Our View
In attempting to interpret the IDEA and its regulations to resolve this case, we acknowledge, as have others, that the fundamental problem stems from the ambiguity of the statutory and regulatory language. Nonetheless, some basic principles are discernible.
We agree with the Fifth Circuit that Congress clearly intended that disabled students voluntarily placed in a private school by their parents are to be “active participants in and beneficiaries of’ programs established under the IDEA. Cefal% 103 F.3d at 397. The level of that participation, however, may be different from the participation by students attending public schools or those placed in private schools by LEAs. Congress clearly differentiated between the three groups of students. Those in public schools are unquestionably entitled to the IDEA’S “free appropriate public education,” including special education and related services. 20 U.S.C. §§ 1401(a)(18), 1412, 1414. Similarly, those placed in private schools by LEAs “will be provided special education and related services ... at no cost to their parents,” § 1413(a)(4)(B)(i). By contrast, for those voluntarily attending private schools, the SEA need only make “provision ... for the participation of such children” in IDEA programs, “to the extent consistent with the number and location of [such] children.” § 1413(a)(4)(A). And although the IDEA regulations suggest that LEAs must provide such services to those students, see note 5, supra, the EDGAR regulations make it clear that such students are entitled only to a “genuine opportunity for equitable participation” in program benefits, which must be “comparable in quality, scope, and opportunity for participation to the program benefits” provided for public school enrollees. 34 C.F.R. §§ 76.651(a)(1), 76.654(a); see also, Russman, 85 F.3d at 1056 (observing that the Anderson decision “is unquestionably correct that the rights accorded disabled students in public school differ from those accorded such students voluntarily placed in private schools”). We agree that children voluntarily placed in private schools are entitled to some level of participation in special education services, but not necessarily the identical level as they would were they in public schools or in private schools pursuant to state or local agency referral.
Accordingly, we reject the proposition that the District must provide a full-time interpreter for Michael at Collegiate, once his parents have asked for the provision of such services. We agree'with other courts in holding that the IDEA and its regulations create no automatic right to any and all special education services at a private school site for all students voluntarily attending such a school. See Cefalu, 103 F.3d at 397 (“It is clear that the statute does not mandate that services for students voluntarily enrolled at private schools be provided on-site at the private school.”); Russman, 85 F.3d at 1055 (“[W]e do not take the position that the IDEA requires the on-site provision at private schools of any and all services that might be required in the context of public education-”); Anderson, 81 F.3d at 678 (“[P]ublic schools need not provide comparable benefits to students voluntarily attending private school in every instance.”); Goodall, 930 F.2d at 369 (holding that the statutory and regulatory requirements were satisfied by the district’s offering to provide special education services at a public school site); cf. Murray v. Montrose County Sch. Dist. RE-1J, 51 F.3d 921, 930 (10th Cir.1995) (holding that there is no presumption under the IDEA that the least restrictive environment in which to educate a disabled student is the neighborhood school). As indicated above, the language of the statute and regulations refute any such argument. That conclusion does not, however, mean that LEAs have no obligation to provide such services at private school sites, in some cases.
*-778 Rather, we agree with other circuit court decisions which have recognized that the IDEA and its regulations afford considerable discretion to educational agencies to determine the manner and extent of services to be provided. . Cefalu, 103 F.3d at 396-97; Anderson, 81 F.3d at 678 (“[T]he public school has discretion over what services to provide.”); However, that discretion is not unfettered. Otherwise, the student’s “genuine opportunity for equitable participation” and the requirement that benefits be “comparable” would be meaningless. See Cefalu, 103 F.3d at 396-97. We accordingly also reject the proposition that the District has unfettered discretion to simply deny Michael such services at Collegiate, and claim to have fulfilled its obligations under the IDEA by offering those services to Michael at a public school.
We therefore agree with the decisions in Russman and Cefalu that, while LEAs have considerable discretion to determine how they will provide services to students voluntarily placed in private schools, that discretion has parameters. We disagree with the Anderson and Goodall decisions, which appear to confer virtually unfettered discretion on LEAs to deny services on-site at private schools.
We now consider what properly confines that discretion. In attempting to provide some rational criteria to guide that discretion, and to apply the statute and the regulations, we note that there are some inherent problems. First, the statute and regulations generally refer to groups of students, as perhaps they must, whereas in many cases, as in this case, we deal with an individual student. Thus, the statutory and regulatory reference to the “number” and “location” of private school students, as a reference to groups of students, is difficult to apply to an individual student’s situation. Second, the statute and regulations refer to all special education services, again as perhaps they must, whereas, in practice, there are different types of special education services, some of which present unique problems. For example, certain special education services can easily and effectively be provided to private school students at public school sites after school. The student receives the benefit of the service, and the school incurs no added cost because it makes the service available in the same setting it would were the child enrolled in the public school. Other services, however, such as the sign language interpreter at issue in this case, cannot be effectively provided to a private school student anywhere other than the private school site, because they confer no benefit unless they accompany the child throughout his or her educational day. See generally, Dixie Snow Huefner & Steven F. Huefner, Publicly Financed Interpreter Services for Parochial School Students with IDEA-B Disabilities, 21 J.L. & Educ. 223 (1992). Despite these problems inherent in the statutory and regulatory scheme, we endeavor to apply them to this case.
While the IDEA and its regulations do not specifically refer to cost as a relevant factor, courts which have addressed this issue refer to cost as a highly relevant factor for school districts to consider when determining whether to provide particular services to private school students. As the Fifth Circuit in Cefalu observed, “educational agencies must be afforded the broadest discretion to design special programs in the light of the finite funds that are available.” Cefalu, 103 F.3d at 397 (emphasis added). In considering 34 C.F.R. § 76.651’s requirement that a sub-grantee provide voluntarily enrolled private school students “with a genuine opportunity for equitable participation” in IDEA program benefits “in a manner that is consistent with the number of eligible private school students and their needs,” the Cefalu court held that “[t]he word ‘equitable,’ certainly in the context of the finite funds available, means fair to all concerned, not simply fair to the private school student; in this context, it means not unfair to others depending on the same pool of money for services and benefits.” Cefalu, 103 F.3d at 397. Similarly, the Russman court “read the IDEA to mean only that, where the provision of services at a distant private school would entail significant additional costs, e.g., transportation, to be borne by the state, public school authorities may fulfill their IDEA obligations by offering the services at a local public school.” Russ- *-777 man, 85 F.3d at 1056.[9] Such a “gloss” on the IDEA, which by its terms appears to contemplate only a disabled child’s individual needs, is an entirely reasonable, and realistic, interpretation of a statute designed to provide necessary educational services to all disabled students, but with an inevitably limited, or finite, pool of funds.
We do not suggest that cost alone, however, is the only factor which LEAs may consider in determining what services will be provided to voluntarily-placed private school students. As indicated, LEAs can and must have considerable discretion in determining how best to serve disabled students. “The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child’s needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the chld.” Board of Educ. v. Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). A variety of educational considerations, including, as in this case, a determination that clustering hearing impaired students in a single location provides some educational benefit to those students, may inform the discretion exercised by the LEA.
Nonetheless, the IDEA clearly contemplates parents voluntarily placing their disabled children in private schools, and those children must be provided with an opportunity to participate in special education services offered at public schools. We accordingly hold, like Russman, that “[wjhere the cost of special services does not vary with where they are provided, the IDEA and regulations regarding voluntary private school students make little sense if such services may be made available only in the public schools.” Russman, 85 F.3d at 1056.[10] We further agree with the Russman court that the reference in the IDEA regulations to “number” and “location” of students, as a reference to groups of students, is of little assistance in determining whether the individualized service Michael seeks must be provided.[11]
In this case, we are not dealing with a group of students in a variety of locations, demanding a variety of special education services. Rather, we are faced here with the question of whether an individual disabled child, who requires an individualized service which only benefits him if it is provided to him on-site, throughout his educational day, is entitled to that individualized service at the private school he has chosen to attend. We conclude that, in such a situation, the District must pay for that service an amount *-776 up to, but not more than, the average cost to the District to provide that same service to hearing-impaired students in the public school setting. Were Michael to remain in Caldwell Elementary, the District would be obligated to provide him with interpretive services. His parents chose voluntarily to place him in Wichita Collegiate, a private school, which they are entitled to do. In our view, it is a fair and reasonable interpretation of the Act and regulations to require the District to pay the same amount towards the special education service (a sign language interpreter) Michael needs in his private school setting, as the average amount the District pays for such services for hearing-impaired students in the public schools.
Our selection of the average amount as the guiding principle finds support in the regulations, as 34 C.F.R. § 76.655(a) provides that a LEA “shall spend the same average amount of program funds on [a] student enrolled in a private school who receives benefits under the program[] and [a] student enrolled in a public school who receives benefits under the program.”. The regulation thus seems to endorse the spending of the average amount spent per student in the public school on an individual private school student. The use of the average amount further takes into account variations in the amounts spent on individuals in the public school, because of the particular needs of their IEPs.[12]
In so holding, we make several observations. The average cost is necessarily derived from costs associated with a number of individual hearing-impaired students, with a variety of IEPs. By directing the District to calculate such an average, we by no means invite, and we strongly discourage, endless argument over each piece of data used to calculate the average. We are very aware that our rule is not mathematically precise, and the calculation of the average cost is not intended to be an exercise in pure mathematics.[13] The District has very broad discretion to calculate the average, using any rational basis, and we will give substantial deference to its calculation.
Our rule will also require ongoing consideration of the relative costs of providing the service, in light of changing populations of *-775 disabled students at public and private schools, and other factors.
Finally, we acknowledge that our holding in this ease may have a very short shelf life. Petitions for certiorari have been filed in Anderson and Russman, and undoubtedly will be in Cefalu and, perhaps, this ease. This is an area in which Supreme Court guidance is needed, and, we hope, forthcoming.
II. Kansas Law
Kan.Stat.Ann. § 72-5393 provides as follows:
Any school district which provides auxiliary school services to pupils attending its schools shall provide on an equal basis the same auxiliary school services to every pupil, whose parent or guardian makes a request therefor, residing in the school district and attending a private, nonprofit elementary or secondary school whether such school is located within or outside the school district.... Speech and hearing diagnostic services and diagnostic psychological services, if provided in the public schools of the school district, shall be provided in any private, nonprofit elementary or secondary school which is located in the school district. Therapeutic psychological and speech and hearing services and programs and services for exceptional children, which cannot be practically provided in any private, nonprofit elementary or secondary school which is located in the school district, shall be provided in the public schools of the school district, in a public center, or in mobile units located off the private, nonprofit elementary or secondary school premises as determined by the school district; and, if so provided in the public schools of the school district or in a public center, transportation to and from such public school or public center shall be provided by the school district.
“Auxiliary services” include “therapeutic psychological and speech and hearing services” and “programs and services for exceptional children.” Kan.Stat.Ann. § 72-5392(b). The term “exceptional children” is defined as school age persons who “differ in physical, mental, social, emotional or educational characteristics to the extent that special education services are necessary to enable them to receive educational benefits in accordance with their abilities or capacities.” Kan.Stat. Ann. § 72-962(f). They include “gifted children.” Kan.Stat.Ann. § 72-962(g).
Having concluded that the IDEA and its regulations provide at least partial relief to the Fowlers, we now consider whether the Kansas statute provides any greater relief— i.e., the provision by the District of an interpreter on-site at Collegiate regardless of the cost.
As the district court observed, the Kansas statute requires the provision of an “auxiliary service” on an “equal basis” unless it cannot be “practically provided.” We can find no authoritative case law from Kansas elucidating the meaning of those phrases. We agree with the district court, however, that the state law “must be read in light of the federal regulations and the [Kansas State Plan for Special Education Article XII].” Fowler, 900 F.Supp. at 1546.[14] The District contends that requiring it to provide an interpreter to Michael at Collegiaté, even if it would cost the District more to do so than to provide an interpreter to Michael at Caldwell, would violate the “equal basis” provision, because it would require the expenditure of more funds *-774 for Michael than for a similarly situated public school student. Thus, he would be unequally, and more favorably, treated. We agree with the District that, as with the IDEA and its regulations, cost must play a role in determining whether a service is provided on an “equal basis” under Kan.Stat. Ann. § 72-5393. We therefore conclude that, under the Kansas statute, construed in light of our interpretation of the federal regulations, Michael is entitled to no more than he is under the IDEA and its regulations: the provision of an interpreter on-site at Collegiate at a cost no greater than the average cost of providing hearing-impaired students with interpretive services at public schools.
III. Attorney’s Fees
Under § 1415(e)(4)(B) of the IDEA, district courts may award attorneys’ fees “to the parents or guardian of a child or youth with a disability who is the prevailing party.” “Congress intended the term ‘prevailing party5 to mean the same under § 1415(e)(4)(B) as it does under 42 U.S.C. § 1988.” Urban v. Jefferson County Sch. Dist. R-1, 89 F.3d 720, 728-29 (10th Cir.1996). Accordingly, “a plaintiff ‘prevails’ when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant’s behavior in a way that directly benefits the plaintiff.” Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). The Fowlers have clearly prevailed; they will receive at least partial, perhaps total, reimbursement for a sign language interpreter the District initially completely refused to pay for or provide.
CONCLUSION
Although the parties have argued in their appellate briefs about the cost of an interpreter at Collegiate and the average cost of providing interpreters to hearing-impaired students at Caldwell, the district court made no specific findings on that issue, other than the following general finding, that “[t]he cost of providing interpretive services to Michael at Collegiate may be higher than the cost of those services at Caldwell. However, some increase in cost is not necessarily financially burdensome to the District.” Fowler, 900 F.Supp. at 1543. We accordingly REVERSE and REMAND this case for further proceedings consistent with this opinion.

. SEE II is a more demanding form of signing than the more prevalent American Sign Language ("ASL”). Donald Oltean, the Hearing Impaired Coordinator for the District, testified that SEE II is more difficult to learn, and involves more physical signing than ASL. Appellants' App., R. Vol. IV at 1111. The District advertised and recruited in an effort to fill the interpreter vacancy, without success, due to an apparent shortage of “well-qualified [interpretive] personnel.” Report at 11-12, Parents* Ex. B., Appellant’s App. Vol. Ill at 692-93.

. The IDEA, which provides for federal money to state and local agencies to enable them to educate children with disabilities, requires an IEP for each child. A child’s IEP establishes perfor-manee levels, goals, a schedule of services to meet the educational needs of the child, and criteria for evaluating progress towards meeting those goals and needs. See Urban v. Jefferson ' County Sch. Dist. R-l, 89 F.3d 720, 722 (10th Cir.1996); Murray v. Montrose. County Sch. Dist. RE-1J, 51 F.3d 921, 923-24 n. 3 (10th Cir.1995), cert. denied, - U.S. -, 116 S.Ct. 278, 133 L.Ed.2d 198 (1995).

. Michael's mother, Barbara, therefore served as Michael’s interpreter at Wichita Collegiate during the 1994-95 school year.

. The Fowlers apparently relied primarily on Kansas law before the hearing officer.

. As an example of the ambiguity and lack of clarity of the regulatory scheme, we note that § 300.451(a) provides that SEAs must merely provide "for the participation” of voluntarily-placed private school students in special education services “to the extent consistent with their number and location.” Yet, § 300.452 provides that LEAs "shall provide” such special education services to those students. Thus, those regulations appear to give discretion to SEAs to determine the level of participation, but arguably require LEAs to provide those services. As we discuss further, infra, the EDGAR regulations, incorporated by reference into the IDEA regulations, do not impose any such mandate on LEAs.

. 34 C.F.R. §§ 76.651-.662, which the IDEA regulations incorporate by reference, are from the Education Department General Administrative Regulations (“EDGAR”).

. We apply both state and federal law standards. "State standards that impose a greater duty to educate handicapped children, if they are not' inconsistent with federal standards, are enforceable in federal court under IDEA.” Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir.1994).

. The district court in this case relied heavily on one of the district court cases, K.R. ex. rel. M.R. v. Anderson Community Sch. Corp., 887 F.Supp. 1217 (S.D.Ind.1995), rav’d, 81 F.3d 673 (7th Cir. 1996), finding that the IDEA required the provision of a full-time instructional assistant on-site at a private school for a voluntarily-placed de-abled student. See also, Cefalu v. East Baton Rouge Parish Sch. Bd., 907 F.Supp. 966 (M.D.La. 1995) (IDEA requires a school district to provide a sign language interpreter on-site at a private school), vacated and remanded, 103 F.3d 393 (5th Cir. 1997); cf. Natchez-Adams Sch. Dist. v. Searing, 918 F.Supp. 1028, 1037 (S.D.Miss.1996) (IDEA requires "the local school district to make an equitable distribution of the IDEA resources made available to it among eligible students regardless of whether they attend a district school or a private school.”).

. The Supreme Court also recognized that cost was a relevant factor in evaluating the obligation of a school district to provide services under the IDEA’S predecessor statute, the Education of the Handicapped Act. See Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883, 892, 104 S.Ct. 3371, 3377, 82 L.Ed.2d 664 (1984) (in determining whether the Secretary of Education’s definition of "medical services," which the statute does not compel school districts to provide, comported with Congressional intent, the Court observed that "the Secretary could reasonably have concluded that [the medical services exclusion] was designed to spare schools from an obligation to provide a service that might well prove unduly expensive _”).

. While the burden-shifting rule of Cefalu has some initial appeal, because it presents an orderly and logical way for the LEA and the student to present their evidence and make their case for or against the provision of particular services on-site at a private school, we decline to follow it, for the simple reason that such a burden-shifting rule has no basis in the language of the IDEA or its regulations. Moreover, in our circuit, we have stated that the "burden of proof ... rests with the party attacking the child’s individual education plan." Johnson v. Indep. Sch. Dist. No. 4, 921 F.2d 1022, 1026 (10th Cir.1990). See generally, Dixie Snow Huefner & Perry A. Zirkel, Burden of Proof under the Individuals with Disabilities Education Act, Individuals with Disabilities Educ.L.Rep. (LRP Publication), Spec.Rep. No. 9 (1993). Thus, we generally prefer the Russman approach, which confers discretion upon LEAs to deny on-site provision of services only where the cost of such services exceeds the cost of such services in the public school, thereby ensuring that private school students receive "comparable” benefits, but not greater benefits than their public school counterparts. As we explain more fully, infra, we do, however, reach a slightly different conclusion from Russman.

.The reference to the “number" and "location" of private school students must mean, as the Russman court held, that where economies of scale, or geographical considerations, make it economically infeasible to provide certain services at private school locations, LEAs may make them available only at public school settings.

. In concluding that school districts should not be obligated to pay more for special education services for voluntarily-placed private school students than they would for the identical service provided to public school students, we note that this might initially appear to conflict with one of the EDGAR regulations, which the IDEA regulations incorporate by cross-reference. As stated in 34 C.F.R. § 76.655(b):
The subgrantee shall spend a different average amount on program benefits for students enrolled in private schools if the average cost of meeting the needs of those students is different from the average cost of meeting the needs of students enrolled in public schools.
Id. The district cotut in this case relied upon this provision to support its conclusion that the District was obligated to provide interpretive services to Michael at Collegiate, despite the possibility that it would be more expensive to do so.
In our view, that single regulation cannot alter what appears to be the intent of the IDEA and the other regulations, which clearly put voluntarily-placed private school students on a different footing than public school students. If, as we and other courts have held, such private school students are not entitled to the identical special education services as public school students, but rather an equitable opportunity to participate in comparable benefits, it would be anomalous to provide that the local agency "shall” spend "a different average amount” on the entire group of private school students, possibly a much greater average amount, “if the average cost of meeting the needs of those students is different from the average cost of meeting the needs” of public school students. For example, if three hearing-impaired students attend three different private schools, the average cost of providing those three students with interpreters would surely be much greater than the average cost of providing interpretive services to three hearing-impaired students clustered in a single public school.
In sum, we doubt that Congress intended such a result under the IDEA; thus, the regulation must not have intended such a result, or, if it did, we will not give effect to such an interpretation. See Joy Technologies, Inc. v. Secretary of Labor, 99 F.3d 991, 996 (10th Cir.1996) ("We refuse to give effect to an interpretation of a regulation which is not 'reasonable and consistent with the statute’ that the regulation is meant to implement.”) (quoting United Telecommunications, Inc. v. Commissioner, 589 F.2d 1383, 1390 (10th Cir.1978)).

. For example, if a LEA has no hearing-impaired students in its public schools, there would be no costs from which to derive an average. Other particular factual scenarios may result in a variety of average cost estimates for different LEAs.

. The Kansas State Plan provides, in pertinent part, as follows: "K.S.A. 72-5393 and K.A.R. 91-12-39 sets [sic] forth the responsibilities of school districts for children and youth with an exceptionality enrolled in private schools.” Plan at Ch. XII, Policies § 1, Appellant’s App., R. Vol. V at 1337. It further states that “school districts must make available to private school students ... appropriate special education services, as specified in an individualized education program.” Id. at § 1(b). Evidently tracking the language of federal regulations, the Plan also states that:
[t]he services provided to private school students must be comparable in quality, scope, and opportunity for participation in the services provided for public school students. However, if the needs of students enrolled in private schools are different from the needs of students enrolled in public schools, the local education agency must provide different services appropriate to individual needs.
Id. at § 2. The Plan does not include a provision comparable to 34 C.F.R. § 76.655(b), which discusses costs of meeting the different needs of private school students.