**Michael FOWLER, by his parents and next friends, Jay and Barbara FOWLER, Plaintiffs,**

v.

**UNIFIED SCHOOL DISTRICT NO. 259, Defendant.**

Civ. A. No. 94–1521–DES.

United States District Court, D. Kansas.

Oct. 16, 1995.

---

Mary K. Babcock, Martha Aaron Ross, Foulston & Siefkin, Wichita, KS, for plaintiffs Jay Fowler and Barbara Fowler, parents and next friends of Michael Fowler.

Thomas R. Powell, Roger M. Theis, Hinkle, Eberhart & Elkouri, Wichita, KS, for defendant Unified School District No. 259, Sedgwick County, Kansas.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

### I. INTRODUCTION

This matter is before the court following trial without a jury. Plaintiff, Michael Fowler, a profoundly deaf ten-year old gifted student, challenges the denial by defendant, Unified School District No. 259 ("District"), of interpretative services at Wichita Collegiate School, a private nonsectarian school. Plaintiff brought this action pursuant to the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq. In addition, plaintiff asserts a violation of state law pursuant to K.S.A. 72–5393.

Defendant school district, does not dispute that K.S.A. 72–5393 is applicable to this case, but argues the services "cannot be practically provided."

Plaintiff must prevail in this case. After carefully and thoroughly reviewing the administrative record on appeal, considering the testimony at trial, the exhibits, the oral and written arguments of the parties, the court makes the following findings of fact and conclusions of law.

### II. FINDINGS OF FACT

1. Michael Fowler ("Michael") was afflicted with meningitis as an infant and as a result is perlingually and profoundly deaf.

2. Michael successfully participated in the parent-infant and preschool programs offered by USD No. 259.

3. From kindergarten through the third grade, Michael attended Caldwell Elementary School ("Caldwell") where he was mainstreamed with only minimal resource room support.

4. Michael was able to function well in the mainstream environment, in part, because he had access to sign language interpreters utilizing Signed Exact English II ("SEE II").

5. In addition to interpretive services, Michael received: (1) speech/language services; (2) audiological services; and (3) assistive services from the District.

6. The services were provided, at public expense, pursuant to Michael's individualized education plan ("IEP").

7. In November, 1993, Michael was tested by the District and determined to be of very superior intellectual capacity. The District provided no special program to address Michael's intellectual ability.

8. On May 23, 1994, Jay and Barbara Fowler ("the Fowlers"), Michael's parents, requested a review of Michael's IEP. The Fowlers notified the District of their objection to the placement and educational plan for Michael.

9. The Fowlers had obtained an independent educational evaluation of Michael. Following this evaluation, the District designated Michael as gifted.

10. Because of their objection to Michael's placement and educational plan, the Fowlers enrolled Michael in Wichita Collegiate ("Collegiate"), a private nonsectarian school.

11. Michael attended Collegiate during the 1994–95 school year and is enrolled and attending Collegiate this fall.

12. The Fowlers requested that the District provide Michael interpretive services

on-site at Collegiate at public expense pursuant to the IDEA and K.S.A. 72–5393.

13. The District denied the request.

14. The District, for reasons of administrative practicality and educational philosophy, has clustered deaf special education services for all elementary school children at Caldwell.

15. Of the 400 children at Caldwell, approximately 30 are profoundly hearing impaired and require some degree of interpretive assistance.

16. The cluster approach promotes an environment which is designed to maximize language skills by providing hearing impaired children the opportunity to communicate with similarly disabled children and with hearing children who also learn to sign and communicate with the hearing impaired children.

17. The cluster approach also allows staff interpreters to be centrally located which in turn allows a flexible schedule for the interpreters and an efficient use of scarce resources.

18. The District has made a commitment to insuring that interpreters are given sufficient breaks throughout the day. This reduces the likelihood of injury and burn-out from this highly intensive and stressful activity.

19. The cluster approach also seeks to insure sufficient preparation time for interpreters.

20. During the 1994–95 school year, the District employed eight interpreters at Caldwell, although there were appropriations for nine positions.

21. The District was unable to fill the ninth position.

22. There appears to be a shortage of SEE II interpreters in the District and in other areas.

23. The SEE II method is generally more difficult to learn than the more common American Sign Language ("ASL"). In addition, signing and interpreting by SEE II is a more taxing endeavor than signing and interpreting by ASL.

24. The District has a policy that interpreters will be with the children throughout the entire school day, including recess and lunch periods. This policy ensures that the hearing impaired child always has the ability to communicate and to receive communication.

25. Because of the above stated policy, the District determined that it would be required to provide more than one interpreter at Collegiate to serve Michael.

26. The District asserts, therefore, that one-on-one interpretive services could not be "practically provided" at private schools throughout the District.

27. Barbara Fowler served as Michael's interpreter at Collegiate for the 1994–95 school year.

28. Collegiate officials structured Michael's daily schedule to allow Barbara Fowler sufficient down time, break time and preparation time during the course of the day. Such scheduling greatly reduces the need for a back-up interpreter.

29. Michael will continue to need interpretive services during the course of his school career.

30. Michael's need for gifted services were met this past year at Collegiate when the District provided a gifted consultant who met monthly with Michael's teacher at Collegiate.

31. On May 30, 1995, an IEP meeting was conducted to discuss Michael's intellectual and academic potential and to determine the appropriate services to meet Michael's special educational needs.

32. The team developed an IEP which requires full-time interpretive services, assistive devices, speech/language services and audiologist services. In addition, the team determined that Michael should have 180 minutes of gifted services per day in a gifted resource room.

33. Caldwell does not have a gifted resource room. During the IEP meeting, the team discussed transporting Michael to Minneha Elementary School to receive the services in a gifted resource room.

34. During the trial to the court, the District indicated it would consider establishing a new gifted resource room at Caldwell and

transfer some students currently receiving such services at other schools to Caldwell.

35. There is currently no gifted resource room program at Caldwell. Michael, at this point, would be the only hearing impaired student in the gifted room, which would result in him receiving one-on-one interpretation during the hours he was in the room.

36. There are at least two other hearing impaired students within the District who are not placed at the cluster schools and who receive one-on-one interpretive services.

37. There was no evidence that the interpreters in these special situations had regularly scheduled back-up interpreters.

38. The cost of providing interpretive services for Michael at Collegiate may be higher than the cost of those services at Caldwell. However, some increase in cost is not necessarily financially burdensome to the District.

39. Because the District has provided individual interpreters in other special settings, there is no indication that doing so in this instance will be administratively burdensome to the District.

40. The District's argument that supervision of an interpreter at Collegiate would present an overwhelming burden to the District is not supported by the evidence that other individual interpreters work without on-site supervision at Starkey Developmental Center and the Vo–Tech School.

41. The Fowlers requested a Level I due process hearing on May 23, 1994. That hearing was held on August 4, 1994.

42. The hearing officer issued his decision on August 25, 1994, concluding that the District was obligated under IDEA to provide interpretive services for Michael at Wichita Collegiate pursuant to K.S.A. 72–5393.

43. On September 12, 1994, the District appealed the decision to the State Board of Education.

44. A state Review Officer was assigned and on October 5, 1994, the record of review was opened to permit submission of additional evidence by the District. Plaintiff objected to the taking of additional evidence.

45. The Review Officer conducted a hearing on October 13, 1994. At that hearing, the Review Officer ruled that the District could submit affidavits by October 24, 1994, to rebut affidavits offered by the Fowlers at the hearing. The Fowlers objected to the ruling.

46. On November 4, 1994, the Review Officer reversed the decision of the Hearing Officer, ruling that the District was not required to provide one-on-one interpretive services for Michael at Collegiate. The officer noted that the statute requires the District to provide services to students in private schools on a "equal basis" and found that one-on-one interpretive services for Michael were greater services than what the District was providing students in the public schools.

47. The Fowlers commenced this action seeking judicial review of an administrative order in this court on November 29, 1994.

### III. *CONCLUSIONS OF LAW*

1. The decision of the Review Officer is properly reviewed by this court pursuant to 20 U.S.C. §§ 1400, *et seq.* Jurisdiction and venue properly lie in this court.

2. 20 U.S.C. §§ 1400, *et seq.*, requires a school district to provide a "free appropriate public education" (FAPE) to special education students within its jurisdiction.

3. Plaintiffs have exhausted their administrative remedies in accordance with 20 U.S.C. § 1415(c).

■ 4. The burden of proof in this matter rests with the plaintiffs who are challenging the ruling of the state Review Officer. Although there is a split of authority on this issue, the court finds that the plaintiffs, as the challenger, are required to carry the burden of proof. *Johnson v. Ind. Schl. Dist. No. 4,* 921 F.2d 1022, 1026 (10th Cir.1990), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 79 (1991).

5. The Fowlers assert that the school district must "provide special education and related services designed to meet the needs of private school children with disabilities residing in the district." 34 C.F.R. § 300.452.

■ 6. A district court reviews an administrative decision under IDEA by a modified de novo standard of review. *Murray v. Montrose County School Dist.,* 51 F.3d 921,

927 (10th Cir.) *cert. denied* —— U.S. ——, 116 S.Ct. 278, —— L.Ed.2d —— (1995).

The IDEA specifically requires a district court reviewing a challenge under the IDEA to "receive the records of the administrative proceedings, ... hear additional evidence at the request of any party, and basing its decision on the preponderance of the evidence," grant any appropriate relief. 20 U.S.C. § 1415(e)(2). Thus, the court does not use the substantial evidence standard typically applied in the review of administrative decisions, "but instead must decide independently whether the requirements of the IDEA are met." *Board of Educ. v. Illinois State Bd.*, 41 F.3d 1162, 1167 (7th Cir.1994).

However, "[t]he fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." [*Board of Education v.*] *Rowley*, 458 U.S. [176] at 206 [102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982) (quoting 20 U.S.C. § 1415(e)(2)). The district court must therefore independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving "due weight" to the administrative proceedings below. This has been described as "modified *de novo* review," or as "involved oversight." *Id.*

7. K.S.A. 72–5393 is applicable to this case and provides in relevant part:

Any school district which provides auxiliary school services to pupils attending its schools shall provide on an equal basis the same auxiliary school services to every pupil, whose parent or guardian makes a request therefor, residing in the school district and attending a private, nonprofit elementary or secondary school.... Speech and hearing diagnostic services and diagnostic psychological services, if provided in the public schools of the school district, shall be provided in any private, nonprofit elementary or secondary school which is located in the school district. Therapeutic psychological and speech and hearing services and programs and services for exceptional children, which cannot be practically provided in any private, nonprofit elementary or secondary school which is located in the school district, shall be provided in the public schools of the school district, in a public center, or in mobile units located off the private, nonprofit elementary or secondary school premises as determined by the school district.

## IV. *DISCUSSION*

At the outset, the court wishes to note its appreciation for the manner in which this matter was presented to the court. Counsel for both parties were exemplary in preparing for, trying, and arguing the case.

■ When stripped of all the rhetoric, specialized language and emotion, the issue before this court is really quite simple: Must the District provide interpretive services for Michael Fowler at Wichita Collegiate? After careful consideration, the court answers the question in the affirmative, thereby reversing the decision of the state Review Officer. While sympathetic to the plight of educational administrators who are asked to spread limited resources ever more thinly, the court is convinced the law requires this result.

■ First, there is no disagreement that the IDEA extends benefits to private school students. 20 U.S.C. § 1413(a)(4). The regulations provide that if a student's special needs can be provided in the public schools and if the parents choose to place the child in a private school, the public school system is not required to pay the cost of the child's attendance at the private school. 34 C.F.R. § 300.403(a). However, in such a situation, the school system must still provide special education and related services designed to meet the needs of private school children with disabilities. 34 C.F.R. § 300.452. *K.R. by M.R. v. Anderson Community School Corp.*, 887 F.Supp. 1217 (S.D.Ind.1995).

■ Those services "for students enrolled in private schools must be comparable in quality, scope and opportunity for participation." C.F.R. § 76.654. Furthermore, the regulations require that the same average amount of program funds shall be spent

on a student enrolled in a private school and a student enrolled in a public school except that a different average amount shall be spent

> "on program benefits for students enrolled in private schools if the average cost of meeting the needs of those students is different from the average cost of meeting the needs of students enrolled in public schools." 34 C.F.R. § 76.655.

The plain language of the regulation shows that the primary factor in determining what services to provide students in either public or private schools is the need of each student, not the cost of the service. *Kruelle v. New Castle Co. School District,* 642 F.2d 687, 695 (3d Cir.1981).

The different average, different need language in § 76.655 is nearly identical to language in the Kansas State Plan For Special Education ("Plan") at Article XII, Policies, § 2. The Plan provides: "However, if the needs of students enrolled in private schools are different from the needs of students enrolled in public schools, the local education agency must provide different services appropriate to individual needs." The mandatory language, *shall* and *must,* of both the federal regulation and the state plan leaves no doubt that school systems must first look to the needs of its students, not to program costs or potential problems in program delivery.

The court also finds that the above cited requirements are not inconsistent with the words of the K.S.A 72–5393 which provides that a "school district which provides auxiliary school services to pupils attending its schools shall provide on an equal basis the same auxiliary school services to every pupil, whose parent or guardian makes a request therefor, residing in the school district and attending a private, nonprofit elementary or secondary school." Additionally, the court is not convinced that the words of the statute which call for services for exceptional children "which cannot be practically provided in any private, nonprofit elementary or second-

ary school ... shall be provided in the public schools," mandate the denial of Michael's claim.

The key words of the statute, and the ones on which this case hangs are "equal basis" and "practically provided." The District would have the court conclude that the provision of interpretive services to Michael at Collegiate is "more than equal" and that those services cannot be "practically provided." The court disagrees.

In *K.R. by M.R.,* plaintiff was confined to a wheelchair as the result of several serious conditions: myelomeningocele, spina bifida, and hydrocephalus with a shunt. 887 F.Supp. at 1219. K.R. initially attended the public schools and was provided with related educational services including the services of a full-time instructional assistant. When K.R.'s parents decided to place her in a private parochial school, they requested that the school corporation ("Corporation") provide an instructional assistant. The Corporation refused. *Id.* at 1220.

The Corporation acknowledged that K.R. could not function without an instructional assistant, but refused to provide an assistant claiming that federal regulations did not require it to do so and further claiming that providing an instructional assistant would violate the general goal of safety included in K.R.'s IEP. In addition, the school claimed that providing such services would violate the Indiana Constitution which prohibits expending public funds for the benefit of religious institutions. *Id.* at 1221.

While *K.R. by M.R.* is distinguishable from the case before this court because here there is no religious issue and no real safety issue, the court finds the case strikingly similar, well-reasoned and applicable to the case at hand.[1] The crux of the court's holding in *K.R. by M.R.* is that a flat refusal to provide services that are requested and designated by all in the IEP as necessary to the individual's special needs can only be justified by

---

1. One could argue that there is a safety issue if Michael does not have an interpreter with him at all times during the day at Collegiate or that there are safety issues relating to the interpreter's need for relief from his/her duties. Neither of those concerns is truly germane to the issue before the court, because the District has stated that if the court finds that it must provide interpretive services for Michael it will assign interpretive staff to cover the entire day and to provide appropriate relief.

showing that there is no reasonable way to provide the services.

Showing there is no reasonable way to provide services is akin to showing services cannot be practically provided as required in the K.S.A. 72–5393. Practical has been defined as "that which is possible of reasonable performance." *Greene v. Valdese,* 306 N.C. 79, 291 S.E.2d 630, 634 (1982). Practical and reasonable are closely associated terms, and the court finds that the District cannot deny interpretive services to Michael at Collegiate unless it can prove there is no reasonable way to provide those services.

The District has not done so. In fact, by providing interpreters for individual students in some Caldwell classrooms, by sending individual interpreters for hearing impaired students at the Vo–Tech and at Starkey, the District has shown that there is a reasonable way to provide interpretive services to individual hearing impaired students away from the cluster site. It is incongruent to now claim that such services cannot be reasonably provided in Michael's case.

■ The District's argument that cost of providing the services is too high is inconsistent with the language of the federal regulations, the state statute, or the Plan. Michael is a prime example of what the language in both the federal regulations and the Plan specifically means: where there are different needs in students in public and private schools, those differences must be met even if the cost of meeting those needs is higher in the case of private school students. 34 C.F.R. § 76.655(b); Kansas State Plan for Special Education Article XII, Policies, § 2. K.S.A. 72–5393.

All parties agree that Michael cannot function without an interpreter. All parties agree that this service is indisputably tied to Michael's special needs. All parties agree that if Michael were attending Caldwell, he would be provided with full-day interpretive services.[2] All parties acknowledge that there are hearing impaired public school students who sometimes receive interpretive services on a one-to-one basis and that if Michael

were to attend Caldwell, it is possible that he would at times during the day be receiving such one-on-one services. The fact that he would certainly be receiving such services at Collegiate does not violate the equal basis language of the § 72–5393. Equal basis must be read in light of the federal regulations and the Plan.

A proper reading of all the regulatory and statutory provisions and the applicable case law leads to the inescapable conclusion that the District must provide interpretive services for Michael at Collegiate. The court has carefully and thoroughly reviewed the record including the Hearing Officer's Decision and the Review Officer's Report, has taken additional evidence through testimony before this court, and has received both the oral and written arguments of the parties. The court finds that the plaintiff has shown by a preponderance of the evidence that the District must provide interpretive services to Michael at Collegiate in accordance with his IEP.

Plaintiff's request for declaratory and injunctive relief is granted.

**IT IS THEREFORE BY THE COURT ORDERED** that the plaintiffs' motion for injunctive relief is granted and the defendant is required to provide interpretive services to Michael Fowler at Wichita Collegiate.

**IT IS FURTHER ORDERED** that plaintiffs are awarded reimbursement in the amount of $15,550.43 for the cost of interpretive services for the 1994–95 school year and an additional amount for the cost of services to date in the 1995–96 school year.

**IT IS FURTHER ORDERED** that plaintiffs submit a petition for attorneys fees and costs pursuant to 20 U.S.C. § 1415(e)(4) and 42 U.S.C. § 1988.

---

**2.** Although the District would argue that the services would be available based on the cluster approach rather than a one-on-one approach, the testimony showed that because Michael is also

gifted there would be hours during the day when he would be the only student in a given room utilizing an interpreter. One-on-one services would, therefore, be provided by the District.