Barkley TUCKER, a minor, By and Through Charles D. TUCKER, M.D. and Marsha Tucker, his parents and next friends; Charles D. Tucker, M.D. and Marsha Tucker, individually, Plaintiffs–Appellants,

v.

CALLOWAY COUNTY BOARD OF EDUCATION; Calloway County School District; Dr. Jack Rose, individually, and as Superintendent of Calloway County Schools; Wayne Blackford; Robbie Hale; Robert McDaniel; Richard Murdock; John Nix; John Warren Nix; Ray Dunn; Garry Evans; Tim Stone; Steve Grogan; Kentucky Department of Education; Wilmer S. Cody, individually, and as Commissioner of Kentucky Department of Education; and Exceptional Children Appeals Board, Defendants–Appellees.

No. 96–6478.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 4, 1997.

Decided Feb. 18, 1998.

James A. Harris, Jr.(argued and briefed), Paducah, KY, for Plaintiffs–Appellants.

Michael A. Owsley (argued and briefed), Regina Abrams (briefed), English, Lucas, Priest & Owsley, Bowling Green, KY, for Calloway County Board of Education, Calloway County School District, Jack Rose, Dr., Wayne Blackford, Robbie Hale, Robert McDaniel, Richard Murdock, John Nix, John Warren Nix, Ray Dunn, Garry Evans, Tim Stone, Steve Grogan, Thomas C. Boysen, Dr., Exceptional Children's Appeal Board, and Wilmer S. Cody.

Michael A. Owsley, English, Lucas, Priest & Owsley, Bowling Green, KY, Morgan G. Ransdell, Office of the Attorney General, Civil Division, Frankfort, KY, for Kentucky Department of Education.

Before: MERRITT and SILER, Circuit Judges; DOWD, District Judge.*

## OPINION

DOWD, District Judge.

Plaintiff–Appellants Dr. and Mrs. Charles and Marsha Tucker ("the Tuckers") brought actions under the Individuals with Disabilities Education Act ("IDEA"),[1] 20 U.S.C. § 1400, *et seq.*, on behalf of themselves and their minor son, Barkley, to recover the costs of providing a free appropriate public education ("FAPE") for Barkley, a disabled child.[2] On August 2, 1996, the district court

---

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1. IDEA provides that any party aggrieved who wishes to challenge the findings and decisions of a State educational agency has the right to bring a civil action in a state court of competent jurisdiction or in a federal district court without regard for the amount in controversy. 20 U.S.C. § 1415(e)(2) (1994).

2. After this appeal had already been filed, IDEA underwent a major overhaul with the passage of Public Law 105–17 on June 4, 1997. *See* Individuals with Disabilities Education Act Amendments of 1997, Pub.L. No. 105–17, 111 Stat. 37 (codified as amended at 20 U.S.C. § 1400, *et seq.*); H.R.Rep. No. 105–95, *reprinted in* 1997 U.S.C.C.A.N. 78. The significance of this statutory revision for the instant case is discussed in Section II A of this opinion.

entered its Memorandum Opinion and Order affirming the administrative decisions of Kentucky's Exceptional Children Appeals Board ("ECAB") which denied the Tuckers' request for reimbursement of costs on the ground that they had voluntarily and unilaterally chosen to enroll Barkley in a private school in Boston and had, by failure to cooperate with local school officials, prevented the creation of an individualized education program ("IEP") for Barkley for the 1993–94 school year. As a result, expenses for Barkley's schooling for that year and for the 1994–95 school year were not, in the district court's judgment, the responsibility of the local public school district. The Tuckers appealed.

### I

Barkley was born on June 10, 1988. After a comprehensive evaluation conducted at the Menninger Clinic in Topeka, Kansas, in November of 1991,[3] he was diagnosed with the condition known as Pervasive Development Disorder ("PDD").[4] PDD is a recognized learning disability which would qualify Barkley for special services under federal and state law.

The Tuckers initially enrolled Barkley in the Murray State University Infant–Toddler Intervention Program ("ITIP") in the Spring of 1991. ITIP is a collaborative effort between the University and the local school district. In March of 1992, Mrs. Tucker had the Menninger report sent to Nancy Lovett, Director of Special Education for the Calloway County School District. Mrs. Tucker then contacted Ms. Lovett and, following a meeting with the Admissions and Release Committee ("ARC"), the Tuckers placed

Barkley in Calloway County Southwest Elementary School pre-school program for 3-year-olds. This was to serve as a transition period between ITIP and the 1992–93 school year. Barkley then attended Southwest during the 1992–93 school year.[5]

The Tuckers, especially Mrs. Tucker, continually looked for opportunities to help Barkley improve. In February of 1993, the Tuckers and Barkley's pre-school teacher attended a conference presented by Dr. Arnold Miller of the Learning and Cognitive Development Center ("LCDC") of Boston, Massachusetts. Following the conference, Dr. Tucker asked Dr. Miller if he would be willing to evaluate Barkley. Mrs. Tucker thereafter sent Barkley's records to LCDC for review.

At an April 16, 1993 meeting with school officials, the Tuckers asked if they could wait until fall to formulate Barkley's IEP for the 1993–94 school year because Barkley would be attending a summer program at LCDC.[6] They wanted the IEP to reflect any improvement which he might show over the summer. School officials agreed that waiting would be a good idea. It seems to be undisputed that the meeting ended with all parties in agreement that Barkley would return to his Southwest pre-school class in the fall of 1993.

There is some dispute over the chronology of subsequent events. Everyone agrees that Ms. Lovett and Dr. Tucker talked by telephone on or about May 6, 1993. Ms. Lovett says Dr. Tucker told her during that conversation that Barkley would be attending school in Boston for a year or so and wanted to know whether the local public school district would pick up the resulting expenses.

---

**3.** At the time of this evaluation, Barkley was three years and five months old (forty-one months). His language development was in the range expected for a child twelve to fifteen months of age.

**4.** Barkley has trouble in two main areas: language/communication skills and social behavior. He has problems with both verbal and nonverbal communication. He employs unusual word use and syntax, exhibits emotional unpredictability, and has difficulty dealing with changes in his environment. He can typically focus on just one thing at a time. In addition, Barkley is impaired in his ability to relate to others.

**5.** During this school year, Mrs. Tucker took Barkley three times per week to Lourdes Hospital in Paducah, Kentucky for speech therapy. She also took him to Murray–Calloway Hospital for physical therapy.

**6.** The IEP that was in place at that time had been prepared on August 28, 1992, and did not have to be reviewed until August of 1993. 34 C.F.R. § 300.343(d) (1997) (review of IEP required at least once a year).

Dr. Tucker says Ms. Lovett told him that the school had decided (unilaterally and without a new IEP) to place Barkley in the general primary school for the 1993–94 school year because he was too old (5 years old) to remain in the pre-school program.[7] Dr. Tucker said that this drove the Tuckers to decide to enroll Barkley in LCDC for the 1993–94 school year, provided he would be accepted there after his initial evaluation. In any event, Ms. Lovett told Dr. Tucker that his request for financial assistance would have to be considered at an ARC meeting.

The ARC meeting was held on May 14, 1993. Mrs. Tucker did not attend this meeting because she was in Boston looking for an apartment. Dr. Tucker purportedly informed the people at the meeting that Mrs. Tucker and Barkley were moving to Boston for a year so Barkley could attend LCDC. The minimum cost of tuition for one year would be $27,000. In view of this information, possible placements in the Calloway County Schools for the 1993–94 school year were discussed. It became clear that the only program being offered for Barkley by the local school district was placement in the general ungraded primary school. This program consisted of homerooms of 48 pupils (5- and 6-year-olds), with 24 students to one teacher, with a "free-flow" of students between classes that would allow as many as 100 students to work together, and with occasional pull-out services for Barkley for speech (and possibly physical) therapy.

Dr. Tucker opposed this placement and asked for a hearing by the Administrative Admissions and Release Committee ("AARC"). This hearing was conducted on May 17, 1993. It concluded with the Tuckers refusing the proposed primary school placement and the AARC refusing to reimburse the Tuckers for any costs associated with LCDC. The Tuckers requested the statutory due process hearing, which was conducted on July 10, 1993.

The hearing officer ultimately decided, on April 9, 1994, that the program offered by the Calloway County School District did not constitute an appropriate placement under the law. She ordered, *inter alia*, that the school district pay Barkley's tuition at LCDC for 1993–94.[8] By the time the hearing officer rendered her decision, the Tuckers had already enrolled Barkley in LCDC and Mrs. Tucker and Barkley had made their move to Boston.

The school board appealed the hearing officer's ruling to the ECAB. On June 22, 1994, the ECAB overruled the hearing officer, concluding that after the Tuckers requested that the development of the 1993–94 IEP be delayed, they had then unilaterally chosen to enroll Barkley in LCDC. The ECAB found that the school district had no responsibility for any costs incurred by the Tuckers.

By the time this decision was rendered, it was time to plan for the 1994–95 school year. The Tuckers wanted Barkley to remain at LCDC and also still wanted the local school district to pay for both school years. They had already filed their first federal lawsuit over the 1993–94 school year expenses. The school board wanted Barkley to come back to the local school for placement in a class of disabled students at North Elementary School. The Tuckers filed a second administrative appeal and, on January 23, 1995, the hearing officer concluded that the school district had followed all state requirements and that no procedural violations had occurred with respect to the formulation of an IEP for 1994–95. The hearing officer also determined that the recommended placement at North Elementary School complied with the IEP and would provide Barkley with a free appropriate public education. This decision was upheld on April 12, 1995 by the ECAB. The Tuckers filed a separate lawsuit in federal court appealing this second decision of the ECAB.

---

7. The district apparently represented to Dr. Tucker that it would lose its federal funding if a five-year-old were enrolled in a pre-school class. The authority for this representation was apparently found in state law. *See* Joint Appendix at 197 (citing 707 KAR 1:150).

8. The hearing officer denied the Tuckers' request for reimbursement for related services such as speech and physical therapy and for other expenses beyond tuition.

The Tuckers' two federal cases were consolidated in the district court. On July 31, 1996, following submission of the matter on the record and briefs, the district court concluded that the Tuckers had made a unilateral decision to get the "world's best" program for Barkley and had not given the school district an opportunity to develop an appropriate IEP for the 1993–94 school year. The court further concluded that, as a result, the defendants were not responsible for any expenses incurred by the Tuckers for the 1993–94 school year. With respect to the 1994–95 school year, the district court concluded that the "stay put" provisions [9] of the relevant statute did not apply since the Tuckers had made clear that LCDC was the only placement they would accept for that school year, notwithstanding having been offered other options by the school district. The court affirmed both ECAB decisions, entered judgment in favor of the defendants, and dismissed the case. The district judge subsequently denied plaintiffs' motion seeking to alter the judgment.[10]

## II

### A

■ Congress first addressed the problem of educating children with disabilities in 1966 when it amended the Elementary and Secondary Education Act of 1965 [11] to establish a grant program "for the purpose of assisting the States in the initiation, expansion, and improvement of programs and projects ... for the education of handicapped children." Pub.L. No. 89–750, § 161, 80 Stat. 1204 (1966). This grant program was repealed in 1970 with the passage of the Education of the Handicapped Act, Pub.L. No. 91–230, Tit. VI, 84 Stat. 175–188 (1970), which later became known as the Individuals with Disabilities Education Act ("IDEA"), codified at 20 U.S.C. § 1400, *et seq.* IDEA was amended several times and, on June 4, 1997, Congress passed a major overhaul of the Act. *See,* Individuals with Disabilities Education Act Amendments of 1997, Pub.L. No. 105–17, 111 Stat. 37 (1997) ("IDEA Amendments").

IDEA, as in effect prior to June 4, 1997, provided federal grants to States, which in turn funded local school districts, for assistance in educating disabled students. A State that accepted IDEA grants was required to have in effect a policy and a plan that assured all children with disabilities the right to a free appropriate public education. 20 U.S.C. § 1412(1) and (2)(B) (1994). The local school district was required to prepare for each disabled child an IEP which identified that child's special education needs and the related services necessary to meet those needs. The school district was then required to provide such education and services at public expense. 20 U.S.C. §§ 1412(4), 1414(a)(5) (1994). If the necessary education and services were unavailable in a public school, the local school district could, at its discretion, place the child in an appropriate private school at public expense. 20 U.S.C. § 1413(a)(4)(B) (1994). If FAPE was available and the parents nonetheless chose to enroll their child in a private school, the school district was not required to pay for that private school education, but was required to "make services available to the child as provided under [34 C.F.R.] §§ 300.450–300.452." 34 C.F.R. § 300.403(a) (1997).[12] Section 300.451 of the regulations

---

9. The IDEA provides in pertinent part as follows:
   ... during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed.
   20 U.S.C. § 1415(e)(3)(A) (1994).

10. After the district court issued its decision, the Tuckers filed a motion for additional findings of fact, amended findings of fact, amended judgment, new trial, altered, vacated and amended judgment, and for relief from the judgment. R. 74.

11. Pub.L. No. 89–10, 79 Stat. 27 (1965).

12. This regulation was originally promulgated in 1992. It has not been substantively changed since then. Also, although IDEA has been overhauled, there are as yet no final regulations implementing the IDEA Amendments. The Department of Education has proposed regulations, which were subject to public comment until January 20, 1998. *See* Assistance to States for the

provided that the State had to ensure "the participation of private school children with disabilities ... by providing them with special education and related services[.]" Any disagreement between a parent and a public agency regarding the availability of a program appropriate for the child, and any question of financial responsibility, were both subject to due process procedures set forth in the regulations. 34 C.F.R. § 300.403(b) (1997) (citing 34 C.F.R. §§ 300.500–300.515).

On June 4, 1997, Congress passed the IDEA Amendments.[13] Pub.L. No. 105–17, 111 Stat. 37 (1997).[14] The new formulation of the statute expressly provides that a child whose needs cannot be met in the local public schools may be placed in or referred to a private school at public expense. 111 Stat. 37, 62.[15] The IDEA Amendments do not require the local school district to pay for the cost of a private school education, including special education and related services, for a

disabled child if FAPE was made available and the parent or guardian of the child nonetheless elected to place the child in a private school. 111 Stat. 37, 63.[16] Further, if a child who previously received special education in the public school, is enrolled by his or her parent in a private school without the consent or referral of the public school, the cost of such private education need not be borne by the local school district unless a court or a hearing officer finds that FAPE was not made available to the child in a timely manner prior to the private school enrollment. 111 Stat. 37, 63.[17]

As already noted, all of the events which precipitated this lawsuit occurred prior to the enactment of the IDEA Amendments. The Amendments specifically provide certain effective dates, depending upon the section of the Amendments. *See,* Pub.L. No. 105–17, Tit. II, § 201, 111 Stat. 37, 156 (1997).[18]

---

Education of Children with Disabilities, 62 Fed. Reg. 55026 (1997) (proposed Oct. 22, 1997).

13. Although all of the events in this case occurred prior to the enactment of the IDEA Amendments, we find it advisable to discuss both the IDEA and the IDEA Amendments in view of the fact that the United States Supreme Court has recently remanded several cases brought under IDEA for consideration in light of the IDEA Amendments. *See, K.R. by M.R. v. Anderson Community School Corp.,* 887 F.Supp. 1217 (S.D.Ind.1995), *rev'd,* 81 F.3d 673 (7th Cir.1996), *cert. granted and judgment vacated,* —— U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997), *on remand,* 125 F.3d 1017 (7th Cir.1997), *petition for cert. filed,* 66 USLW 3428 (U.S. Dec. 9, 1997) (No. 97–960); *Russman by Russman v. Board of Educ. of Enlarged City School Dist. of City of Watervliet, N.Y.,* 945 F.Supp. 37 (N.D.N.Y.1995), *aff'd,* 85 F.3d 1050 (2d Cir.1996), *cert. granted and judgment vacated,* —— U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1008 (1997); *Fowler v. Unified School Dist. No. 259,* 900 F.Supp. 1540 (D.Kan.1995), *rev'd,* 107 F.3d 797 (10th Cir. 1997), *cert. granted and judgment vacated,* —— U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997), *on remand,* 128 F.3d 1431 (10th Cir. Nov. 4, 1997); *Fowler v. Unified School Dist. No. 259,* 907 F.Supp. 348 (D.Kan.1995), *rev'd,* 107 F.3d 797 (10th Cir.1997), *cert. granted and judgment vacated,* —— U.S. ——, 117 S.Ct. 2503, 138 L.Ed.2d 1008 (1997), *on remand,* 128 F.3d 1431 (10th Cir. Nov. 4, 1997).

14. The IDEA Amendments are to be codified at 20 U.S.C. §§ 1400–1487.

15. To be codified at 20 U.S.C. § 1412(a)(10).

16. To be codified at 20 U.S.C. § 1412(a)(10)(C)(i).

17. To be codified at 20 U.S.C. § 1412(a)(10)(C)(ii).

18. Section 201 provides as follows:

(a) Parts A and B.—
(1) In general.—Except as provided in paragraph (2), parts A and B of the Individuals with Disabilities Education Act [Subchapters I and II], as amended by title I, shall take effect upon the enactment of this Act [June 4, 1997].
(2) Exceptions.—
(A) In general.—Sections 612(a)(4), 612(a)(14), 612(a)(16) [20 U.S.C. §§ 1412(a)(4), 1412(a)(14), 1412(a)(16)], 614(d) [20 U.S.C. § 1414(d)] (except for paragraph (6)), and 618 [20 U.S.C. § 1418] of the Individuals with Disabilities Education Act, as amended by title I, shall take effect on July 1, 1998.
(B) Section 617.—Section 617 [20 U.S.C. § 1417] of the Individuals with Disabilities Education Act, as amended by title I, shall take effect on October 1, 1997.
(C) Individualized Education Programs and Comprehensive System of Personnel Development.—Section 618 [20 U.S.C. § 1418] of the Individuals with Disabilities Education Act, as in effect on the day before the date of the enactment of this Act, and the provisions of parts A and B of the Individuals with Disabilities Education Act relating to individualized education programs and the State's comprehensive system of personnel develop-

Nothing in the Amendments, however, suggests retroactive application with respect to cases pending on the date of enactment. Other courts addressing the effect of the IDEA Amendments have held that they have prospective application only. *Fowler v. Unified School District No. 259, Sedgwick County, Kansas,* 128 F.3d 1431,1436· (10th Cir. 1997); *Heather S. v. State of Wisconsin,·* 125 F.3d 1045, 1062 (7th Cir.1997); *K.R. by M.R. v. Anderson Community School Corp.,* 125 F.3d 1017, 1019 n. * (7th Cir.1997); *Cypress–Fairbanks Independent School Dist. v. Michael F. by Barry F.,* 118 F.3d 245, 247 n. 1 (5th Cir.1997), *cert denied,* —— U.S. ——, 118 S.Ct. 690, 139 L.Ed.2d 636 (1998).· This conclusion is consistent with the " 'presumption against retroactive legislation [that] is deeply rooted in our jurisprudence.' " *Hughes Aircraft Co. v. U.S. ex rel. Schumer,* —— U.S. ——, ——, 117 S.Ct. 1871, 1876, 138 L.Ed.2d 135 (1997) (quoting *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994)); *see also James Cable Partners L.P. v. Jamestown, Tenn. by Duncan,* 43 F.3d 277, 279–80 (6th Cir.1995).

Accordingly, our decision here is based upon the statute and regulations in effect prior to June 4, 1997.

**B**

IDEA imposes extensive procedural requirements upon States receiving federal funds under its provisions. Among these is the requirement that parents or guardians who are dissatisfied with "any matter relating to" their disabled child's evaluation or placement must be permitted to submit a complaint and seek an impartial due process hearing to resolve the matter. 20 U.S.C. § 1415(b)(1)(E) and (2) (1994). Thereafter, "[a]ny party aggrieved by the findings and

decision" of the administrative hearing may bring a civil action in a federal district court. 20 U.S.C. § 1415(e)(2) (1994). The federal court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.*

■ The Supreme Court, in addressing the appropriate standard of review has stated:·

[T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the·courts to substitute their own notions of sound educational policy for those of the school authorities which they review.·... The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings....

Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act?[27] And second, is the individualized ·educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? (footnote omitted). If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

[27]This inquiry will require a court not only to satisfy itself that the State has adopted the state plan, policies, and assurances required by the Act, but also to determine that the State has created an

ment, as so in effect, shall remain in effect until July 1, 1998.·
(D) Sections 611 and 619.—Sections 611 [20 U.S.C. § 1411] and 619 [20 U.S.C. § 1419], as amended by title I, shall take effect beginning with funds appropriated for fiscal year 1998.
(b) Part C.—Part C [Subchapter III] of the Individuals with Disabilities Education Act, as amended by title I, shall take effect on July 1, 1998.

(c) Part D.—
(1) In general.—Except as provided in paragraph (2), part D [Subchapter IV] of the Individuals with Disabilities Education Act, as amended by title I, shall take effect on October 1, 1997.
(2) Exception.—Paragraphs (1) and (2) of section 661(g) [20 U.S.C. § 1461] of the Individuals with Disabilities Education Act, as amended by title I, shall take effect on January 1, 1998.

IEP for the child in question which conforms with the requirements of § 1401(19). *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982) (footnote in original). Thus, the *Rowley* Court "concluded that the proper balance is to give greater deference to the state's placement decision if the procedural requirements of the Act are met." *Roncker ex rel. Roncker v. Walter,* 700 F.2d 1058, 1062 (6th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).[19] The review given the decision of an administrative board by the federal court is, therefore, "a modified de novo review." *Doe By and Through Doe v. Board of Educ. of Tullahoma City Schools,* 9 F.3d 455, 458 (6th Cir.1993), *cert. denied,* 511 U.S. 1108, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994).

## C

In this case, the final administrative decisions reviewed by the district court were made by the ECAB. The first lawsuit filed by the Tuckers challenged the June 22, 1994 decision relating to the 1993–94 school year. (Case No. 5:94–CV–188, filed on July 20, 1994) ("Case No. 1"). The second lawsuit challenged the April 12, 1995 decision relating to the 1994–95 school year. (Case No. 5:95–CV–141, filed on May 11, 1995) ("Case No. 2"). A brief review of the pre-resolution proceedings in both cases is helpful.

Case No. 1 was assigned to the docket of Senior U.S. District Judge Edward Johnstone. On October 19, 1994, following a pretrial conference, Judge Johnstone entered an order indicating that plaintiffs would be permitted to take depositions of several experts from LCDC and representatives from the Menninger Clinic.[20] He stated that, "[i]n the event the court determines the matter should be decided on the record before it on this date, the depositions taken by [plaintiffs] shall be considered as proffered proof submitted by plaintiffs." R. 12. Judge Johnstone further stated that "[i]n the event the court rules that the district court should consider the additional proof, the depositions will stand submitted as taken and, in that event, the defendants shall have sixty days to take additional proof in response to the plaintiffs' depositions." *Id.* Immediately thereafter plaintiffs sought leave to further depose Dr. and Mrs. Tucker on the issues of their good faith or lack thereof in dealing with the defendants and on the issue of damages. R. 13. The defendants opposed the motion. On November 18, 1994, Judge Johnstone denied plaintiffs' motion. R. 17.

Depositions of Dr. Arnold Miller, Carleen Franz, Ph.D., and Dr. Kirby Pope were filed by the plaintiffs. R. 24, 27, 28. Without leave of court, as was required by the October 19th order, defendants took the depositions of Sharon Hart[21] and Terez Hjetland.[22] R. 29, 30. In a renewed motion for leave to depose the Tuckers, plaintiffs' counsel asserted that the depositions of Hart and Hjetland had been impermissible under the October 19th order because they were not rebuttal. R. 25. With no opposition from the defendants, Judge Johnstone granted plaintiffs leave to depose Dr. and Mrs. Tucker. R. 31. These depositions were noticed for May 5, 1995 and were eventually filed with the court. R. 41, 42.

---

**19.** *Roncker* was a case involving mainstreaming, the concept that, as much as possible, children with disabilities should be educated along with non-handicapped children. 20 U.S.C. § 1412(5)(B) (1994). This is sometimes referred to as placing a child in "the least restrictive environment." The *Roncker* court noted that this issue was different from the one involved in *Rowley. Rowley* involved a choice between two methods for educating a deaf student. As pointed out by *Roncker,* the *Rowley* Court "emphatically stated that [methodology] questions should be left to the states." *Roncker,* 700 F.2d at 1062 (citing *Rowley,* 458 U.S. at 208, 102 S.Ct. at 3051–52).

**20.** This was granted at plaintiffs' request. Judge Johnstone cited no authority for granting the request but did mention that the defendants had insisted that the matter should be decided only on the basis of the administrative record. Perhaps the Judge deemed additional discovery appropriate in view of 20 U.S.C. § 1415(e)(2) (1994) which requires a district court to "hear additional evidence at the request of a party[.]"

**21.** Ms. Hart had been Barkley's teacher in the spring of 1992.

**22.** Ms. Hjetland had been Barkley's teacher for the 1992–93 school year.

On May 11, 1995, Case 2 was filed. About one week later, plaintiffs in Case 1 filed a motion for the two cases to be consolidated. R. 34. On July 7, 1995, Judge Johnstone reassigned Case 1 to Judge Thomas B. Russell who, at the time, was also presiding over Case 2. Subsequently, on September 14, 1995, Judge Russell stated that because he had been involved in settlement discussions and "since this matter will be a bench trial upon the record and briefs," he found it necessary to recuse himself. R. 50. The cases were reassigned to Judge Joseph McKinley, Jr. who, on January 12, 1996, finally entered an order consolidating the two cases.[23]

Judge McKinley permitted some further depositions on certain narrow topics. Thereafter the case was submitted on the administrative record, the judicial record which consisted primarily of several depositions taken during the course of the judicial proceedings,[24] and briefs.

■ According to the modified de novo standard of review discussed above, the district court was required to make its findings of fact based on a preponderance of the evidence contained in the complete record (including evidence contained in both the administrative record and in the record of deposition testimony made before the district court), while giving deference to the fact findings of the administrative proceedings provided it concluded, in the first step of the *Rowley* test, that the state agency had adhered to the procedural requirements of IDEA.

■ We apply a clearly erroneous standard of review to the district court's findings of fact and a de novo standard to its conclusions of law.

**23.** Although the cases had not been formally consolidated prior to this date, it appears that since they were both eventually on the docket of the same judge, they were treated as consolidated for all practical purposes.

**24.** Although the district judge did not so state, it appears that the deposition testimony must have been submitted in addition to the administrative record, in reliance on 20 U.S.C. § 1415(e)(2) (1994).

### III

As already noted, in the district court, the Tuckers challenged two administrative decisions: (1) the ECAB Opinion and Order of June 22, 1994; and (2) the ECAB Opinion and Order of April 12, 1995. The district court examined each decision separately, as will this Court.

### A

■ It is undisputed that an IEP for the 1993–94 school year was not developed for Barkley at the usual time, i.e., April of 1993, because the Tuckers requested a delay until after Barkley's attendance at the 1993 LCDC summer school session. At that point, the case turns into a classic "chicken/egg problem." The school district argues that it was never given an opportunity to properly develop a new IEP because the Tuckers asked to delay the IEP formulation and then unilaterally informed school personnel that they had decided to send Barkley to LCDC. The Tuckers argue that they made the final decision to send Barkley to LCDC only after they learned that the school district had unilaterally decided to place Barkley in an ungraded primary for the 1993–94 school year. Thus, the challenge to the ECAB's June 22, 1994 decision not to fund Barkley's 1993–94 school year at LCDC comes down to essentially *one* critical factual determination, namely: when the Tuckers made the decision to place Barkley in LCDC.[25]

The district court noted that, although the Spring 1993 meeting adjourned with all parties envisioning that Barkley would return in the fall to the Calloway County Schools, that plan changed "once Barkley was accepted at LCDC." R. 72 at 5. The court quoted Dr. Tucker's testimony from the July 10, 1993 due process hearing, where he stated:

**25.** Under IDEA, if the Tuckers unilaterally decided to place Barkley in LCDC, the local school district was not required to pay for that private school education, even though Barkley had a recognized disability and had been receiving special education services from the local school district.

I remember that I called Dr. Lovett or someone and told them that Barkley was being evaluated in Boston and if he were to be accepted in Boston, we were going to go to Boston.

There was no question in my mind, if he were going to be accepted, we were going to Boston. The only question was, when he would be accepted. If he wasn't accepted until September, I guess Barkley would still be going to Southwest right now. There would be no reason to take him out of Southwest until September 1 from that standpoint.

So, really, I guess the intentions were not to take him out that quick, but whenever he got accepted up there and there was a place for him, there was not a lot of time left. I think we had two weeks to move to Boston.

*Id.* at 5–6. The district court agreed with the ECAB that "the Tuckers made a unilateral decision to place Barkley in LCDC." *Id.* at 6.[26] The court further agreed that this decision was made before a new IEP could be developed.[27] As a result, the court ultimately concluded that IDEA did not require the school district to pay for Barkley's education for the 1993–94 school year.

Our review of the district court's determinations reveals no clear error. In fact, although the district court quoted but one instance of Dr. Tucker's testimony, there are actually several other places in the record which offer additional support for the district court's conclusions. First, Dr. Tucker testified at the July 10, 1993 due process hearing that he knew at the time they began LCDC's evaluation process that, if Barkley were accepted there, "[he] would be gone for a year and ... I knew it could be longer than a year." R. 8, Vol. 3 at 479. Second, Dr. Tucker also testified that two weeks after Mrs. Tucker and Barkley returned from the LCDC evaluation, they found out that Barkley was accepted into the June, 1993 class and "[t]hat is when [Mrs. Tucker] decided ... that she needed to move to Boston to live with Barkley for a year." R. 8, Vol. 3 at 483. Third, Mrs. Tucker testified at the July 10, 1993 due process hearing that, although she initially hoped she would be gone for only a summer with Barkley, LCDC informed her that a summer program would not be long enough. She stated: "So that is why I made the decision to go and then, of course, at the next meeting this federal ruling had been made that he could not have been in the preschool anyway[.]" R. 8, Vol. 3 at 428.[28]

26. *See also,* Joint Appendix at 198.

27. Although ultimately accepting the school district's position, the district court also acknowledged that the school district "made a mistake by offering a placement [without the benefit of a new IEP] when confronted with the Plaintiff's [sic] request for reimbursement[.]" R. 72 at 6. However, the district court discounted that mistake because "at that point in time, the placement decision had already been made by the parents." *Id.*

28. In their brief, the Tuckers object to the district court's statement that the school district "could not develop an IEP without the cooperation and participation of the parents." R. 72 at 6. In fact, they argue that this notion of failure to cooperate was raised for the first time when the ECAB solicited an *ex parte* letter from the school board's attorney during the course of the first administrative appeal. Aside from challenging the propriety of an *ex parte* communication and the truthfulness of the information contained in that communication, appellants also argue that the question of failure to cooperate had been waived by the school board because it had not been raised in the initial stages of the administra-

tive review. They further assert that they never failed to cooperate with the school district and/or school personnel, that they never prevented the school from formulating a new IEP, and that the school simply never asked them to participate in the formulation of a new IEP for the 1993–94 school year.

Without commenting on the propriety of the *ex parte* communication, this Court concludes that this communication, although it may have influenced the ECAB, played no affirmative role in the district court's decision. This Court does not read the district court's remark about failure to cooperate as any sort of indictment of the Tuckers. Rather, the district court was merely commenting that formulation of an IEP, which required parental cooperation and participation, was unlikely and, in fact, unnecessary in a situation where the parents had already made a decision to take their child out of the public school and place him in a private school in Boston. The record is quite clear that the Tuckers had always cooperated with the school district and had worked very closely with the district and with Barkley's teachers. The Tuckers simply chose a private school placement for Barkley without regard for what *might* have been avail-

Having reviewed the district court's determination with respect to the ECAB's June 22, 1994 decision to deny the Tuckers any financial assistance for the 1993–94 school year, we affirm.

### B

■ The Tuckers also challenge the April 12, 1995 decision of the ECAB to deny placement of Barkley in LCDC for the 1994–95 school year. As the district court properly pointed out, a comprehensive IEP was developed and agreed upon by all parties for the 1994–95 school year. The only disagreement was as to placement: the Tuckers would only agree to placement in LCDC, whereas the school district planned to place Barkley in a class of disabled students at North Elementary School.

The Tuckers argue on appeal that the placement proposed by the school district was inappropriate for several reasons. First, they assert that placement with ten other disabled students whose average IQ ranged from 50 to 75 illustrated the school district's consistent underestimation of Barkley's intellectual ability. Barkley has, in all probability, a normal IQ. Second, the Tuckers assert that Barkley had social and communication skills that the children in the proposed setting did not have. Third, the Tuckers argue, apparently unopposed, that moving Barkley was sure to cause regression. Although he had accomplished somewhat significant gains at LCDC during the 1993–94 school year, he was described as "tender" and prone to difficulty with change. Fourth, the Tuckers assert that the school district's refusal to provide for specific transition services until the Tuckers would agree to enroll Barkley in the local public school amounted to a deprivation of such services, which are required by law.

■ As pointed out above, a court reviewing the administrative decisions of a local school district must base its decision on a "preponderance of the evidence." 20 U.S.C.

§ 1415(e)(2) (1994). However, this "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. "[O]nce a court determines that the requirements of the Act have been met, questions of [educational] methodology are for resolution by the States." *Id.* at 208, 102 S.Ct. at 3052; *see also Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir.), *cert. denied*, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988) (parents have no right to compel a specific program or methodology); *Roland M. v. Concord School Committee*, 910 F.2d 983, 993 (1st Cir.1990), *cert. denied*, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991) (issue is not whether the program preferred by the parents is better but whether the program proposed by the school district "struck an 'adequate and appropriate' balance on the maximum benefit/least restrictive fulcrum"); *Barnett by Barnett v. Fairfax County School Bd.*, 927 F.2d 146, 152 (4th Cir.), *cert. denied*, 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991) (the Education of the Handicapped Act [a forerunner of IDEA] mandates an education that is responsive to the handicapped child's needs, "but leaves the substance and the details of that education to state and local school officials").

■ Since "[a]n 'appropriate' public education does not mean the absolutely best or 'potential-maximizing' education for the individual child[,]" *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987) (citing *Rowley*, 458 U.S. at 197 n. 21, 102 S.Ct. at 3046), a court's review "must focus primarily on the District's proposed placement, not on the alternative that the family preferred." *Id.* That proposed placement must be upheld "if it was reasonably calculated to provide [the disabled child] with educational benefits." *Id.*

---

able to him in the local public school because they wanted "the world's best" for Barkley and they believed that LCDC was the only place to get it. As properly noted by the district court: "There is nothing wrong with their wanting the best for their child, however, the IDEA does not require the School District to provide the 'world's best.'" R. 72 at 6. Therefore, this Court sees no need to address further any argument that the *ex parte* communication, raising an issue that had arguably been waived by the defendants/appellees, denied the Tuckers due process.

The placement which the school district offered to Barkley at North Elementary School consisted of a self-contained unit with ten other students between the ages of five and eight. These ten students had a range of disabilities. Two of them were autistic; however, one of those two could carry on a conversation and relay information as well as interact socially. In fact, this particular student was functioning at a higher level than was Barkley. This classroom had a certified special education teacher with fourteen years of teaching experience, along with three full-time aides. The classroom also had three computers. North Elementary School had a full-time speech and language therapist.

Barkley's 1994–95 IEP, agreed to by all parties, provided for daily one-on-one speech and language therapy and for occupational and physical therapy two times each week. LCDC could not and did not provide these services for Barkley. LCDC also had no computers. A communication computer evaluation of Barkley completed on October 18, 1994, showed that he should have access to a computer and a variety of early learning exploratory software programs. Barkley's teacher at LCDC during the 1993–94 school year had not been certified for special education. Moreover, although Barkley was six and one-half years old, at LCDC he had been in a class of three and one-half to four years olds. There was testimony that he needed integration with peers of his own age. Furthermore, the educational psychologist who evaluated Barkley at the Menninger Clinic testified that most children with PDD are educated in the public school setting and that the setting proposed by the school district, which the expert had observed in person, was very typical of the classroom setting in which PDD students have been successfully educated. According to this expert, the critical

issue for Barkley was not the composition of his classroom but that he receive an individualized education based on his IEP. The expert concurred with the 1994–95 IEP which had been developed.

Here it is undisputed that all parties agreed to the IEP, but disagreed as to placement; that is, they disagreed as to methodology. Dr. Miller himself described LCDC's methodology as "unorthodox." He testified that he disagreed with other methods of teaching PDD children, including the multicategorical classroom recommended by the school district for Barkley. There is no dispute that LCDC would not have implemented the agreed-upon 1994–95 IEP.

Case law is clear that the Tuckers are not entitled to dictate educational methodology or to compel a school district to supply a specific program for their disabled child. The district court properly concluded that the school district's proposed placement of Barkley in the special education classroom at North Elementary School was an appropriate placement within the meaning of a "free appropriate public education." [29]

Applying the appropriate standard of review, this Court concludes that the district court's decision with respect to the 1994–95 school year was not in error.

## IV

For the reasons set forth above, the decision of the district court is AFFIRMED.

---

**29.** This Court agrees with the district court that the school district's refusal to formulate a plan for transition services until the Tuckers would first commit to enrolling Barkley in the local public schools was probably a mistake, but one that had no real bearing on the outcome of the situation.

The Court also sees no need to address at any length the Tuckers' argument that IDEA's "stay-put" provisions apply in this case. The Tuckers unilaterally placed Barkley in LCDC for the 1993–94 school year. They cannot properly expect that the Act would require a local school district to bear the cost of such unilateral placement during the pendency of administrative and judicial proceedings. If that were so, any parent could take his or her chances on an initial unilateral placement, banking on the likelihood that appeals would be drawn out for several months and probably over the course of one or two school years, and thereby artificially force the school district to pay for at least the later years of a placement which it had not approved.